867 F.2d 184
 48 Fair Empl.Prac.Cas. 1886,
49 Empl. Prac. Dec. P 38,905, 57 USLW 2507
 Stephanie G. DWYER, Plaintiff-Appellant,
v.
Loyd W. SMITH; Marcus Lipp; Herbert Peacher; N.C. Durham;
Thomas A. Akers; James R. Robertson; City of
Fairfax, Virginia; William O'Donnell,
Defendants-Appellees.
 No. 87-2077.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 3, 1988.
Decided Feb. 3, 1989.
 
 Jack L. Gould, Fairfax, Va., for plaintiff-appellant.
 Joseph Doane Roberts (Kevin L. Locklin, Slenker, Brandt, Jennings and Johnston, Merrifield, Va., Joyce A. Naumann Massey, Verner, Liipfert, Bernhard, McPherson & Hand, Chartered, Washington, D.C., on brief), for defendants-appellees.
 Before RUSSELL and PHILLIPS, Circuit Judges, and KNAPP, Senior United States District Judge for the Southern District of West Virginia, sitting by designation.
 PHILLIPS, Circuit Judge:
 
 
 1
 Stephanie G. Dwyer, a former police officer with the Fairfax City Police Department in Fairfax, Virginia, appeals a district court judgment rejecting a variety of federal and pendent state claims, principally of sex discrimination and sexual harassment, brought against her public employer. Finding no reversible error among the great number assigned, we affirm.
 
 
 2
 * Dwyer was hired as a Fairfax City police officer in December 1981 and served in that capacity until her termination in May 1986. During her first few years with the department, Dwyer received various commendations for her work and above average evaluations from her superiors. Toward the latter part of her employment, however, Dwyer allegedly engaged in several instances of misconduct that impugned her veracity and led to her dismissal from the department. Dwyer alleges that her difficulties began when she started complaining about sexual harassment by male police officers and protesting department policy of requiring all police officers, male and female, to qualify with shotguns in a manner potentially more injurious to women. The defendants allege that Dwyer only initiated this action when the department rejected her offer to stop complaining about the sexual harassment in exchange for shotgun qualification.
 
 
 3
 At the close of Dwyer's case, the United States District Court for the Eastern District of Virginia dismissed Dwyer's Sec. 1983 claims for violations of her first and fourteenth amendment rights; directed verdict for the defendants on Dwyer's pendent state claims of intentional infliction of emotional distress, defamation, and a violation of Virginia's insulting words statute, Va.Code Ann. Sec. 8.01-45; and discharged the jury. At the close of trial, the court entered judgment for the defendants on Dwyer's remaining Title VII claims of sexual harassment, disparate impact, disparate treatment and retaliation. This appeal followed.
 
 II
 
 4
 In Title VII actions, a district court's factual determinations are governed by Rule 52(a)'s clearly erroneous standard even if they resolve the ultimate issue of the action--such as, whether there was discrimination, sexual harassment, or discriminatory intent. Pullman-Standard v. Swint, 456 U.S. 273, 285-90, 102 S.Ct. 1781, 1788-91, 72 L.Ed.2d 66 (1982); Moore v. City of Charlotte, 754 F.2d 1100, 1104 (4th Cir.1985). Therefore, we may only reverse the district court's findings in the present case if we conclude that the ultimate determinations " 'were induced by an erroneous view of the controlling legal standard; or are not supported by substantial evidence; or were made without properly taking into account substantial evidence to the contrary or are against the clear weight of the evidence considered as a whole.' " Moore, 754 F.2d at 1104 (quoting Miller v. Mercy Hosp., 720 F.2d 356, 361 (4th Cir.1983)).
 
 
 5
 * Since Meritor Savings Bank v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), there is no doubt that a plaintiff has a cause of action for sexual harassment under Title VII when discrimination based on sex has created a hostile or abusive work environment. We have held that such an action involves two steps:
 
 
 6
 First, the plaintiff must make a prima facie showing that sexually harassing actions took place, and if this is done, the employer may rebut the showing either directly, by proving that the events did not take place, or indirectly, by showing that they were isolated or genuinely trivial. Second, the plaintiff must show that the employer knew or should have known of the harassment, and took no effectual action to correct the situation. This showing can also be rebutted by the employer directly, or by pointing to prompt remedial action reasonably calculated to end the harassment.
 
 
 7
 Katz v. Dole, 709 F.2d 251, 256 (4th Cir.1983).
 
 
 8
 The district court rejected Dwyer's Title VII claim of sexual harassment, finding that she had failed to present any evidence of sexual harassment that altered the conditions of her employment and created an abusive working environment. In light of the sharply conflicting evidence in the record, the court's determination is certainly "plausible" and withstands Dwyer's attack on appeal. See Anderson v. Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985).
 
 
 9
 Dwyer contends that since she was assigned to defendant Robertson's squad in late 1982 or early 1983, her work life has been rife with innuendo, disparagement, humiliation and insinuation--in short, sexual harassment. She claims that she complained directly to Sgt. Robertson but he took no action; in fact, according to Dwyer, Robertson was the "ring leader" who encouraged similar comments and attitudes toward her by the men on the squad. Dwyer further claims that when she was assigned to different squads, her situation improved, but Robertson still used every opportunity to harass her. She claims that he and the men on his squad placed pornographic material in her station mailbox and jokingly asked her about what she had received. According to Dwyer, Robertson also repeatedly accused Dwyer of having sexual relations with other officers.
 
 
 10
 Dwyer also complains that the other men on the force often engaged in gratuitously graphic conversations about victims of sex crimes and drove by her home to see if she had any male visitors. Additionally, she charges that women were generally referred to in degrading terms and, on one occasion, several officers engaged in a graphic description of sexual behavior while Dwyer was riding in the back seat of a police cruiser. She claims that she repeatedly asked the men to halt their behavior and reported the occurrences to Robertson and other officers in charge to no avail.
 
 
 11
 The defendants present a very different picture of the workplace. They claim that Dwyer received various commendations and standard evaluations from Sgt. Robertson during the time he was allegedly harassing her. They also claim that she often engaged in the "dirty talk" or use of profanity and only complained to her superiors on two occasions: on November 4, 1984, when she received a pornographic mailing and on November 7, 1985, after she was asked to respond to several citizen complaints about her work. According to the defendants, both of Dwyer's complaints spurred some type of investigation. After the first, the supervisor who received the complaint could not determine who placed the mail in her folder but told both his squad and the squad that worked the shift before his to halt such behavior. After the second complaint, an internal affairs investigation was conducted but concluded that Dwyer's accusations were unfounded.
 
 
 12
 During the second investigation, Dwyer gave a recorded statement in which she did not indicate that she reported the various incidents to any supervisors. In fact, the transcript shows that she did not contend at that point that Robertson engaged in any suggestive behavior--only that he treated her like a "problem child." In the same report, Dwyer admitted that she could not recall any of the men who engaged in the sexually explicit conversations but added that most of the men did not use as much discretion as she thought they should.
 
 
 13
 At trial, however, Dwyer claimed that most of the incidents relevant to her action occurred after her recorded statement. She testified that Robertson referred to ex-female police officers as cowards and homosexuals, that he said that one female officer missed work each month during her menstrual period, and that the men under Robertson's direct supervision taunted her. Also at trial, Dwyer's own witness, a female dispatcher, testified that she received immediate, corrective action when she complained about seeing a single dirty picture and that Sgt. Robertson was a "perfect Southern Gentleman."
 
 
 14
 From this evidence, the court found that no sexual language was ever directed at Dwyer; that only one of the mailings could be considered pornographic; that Dwyer had failed to prove the origin of any of the mailings; that one of the pieces of "art work" about which Dwyer complained was actually placed in the stationhouse by another female employee; and that two female police officers testified that sexual harassment did not exist in the Fairfax City Police Department. The court's final conclusion was that Dwyer failed to establish a prima facie claim of sexual harassment.
 
 
 15
 The only credible evidence that I find is that perhaps on occasion there has been inappropriate language and inappropriate references made to sex, but not harassment. And I think that the fact that there was no complaint made by [Dwyer], no testimony of any incidences [sic], no complaint made to anyone prior to her being on the force for the number of years that she had, belies the fact that this was going on.
 
 
 16
 These findings and the district court's ultimate conclusion that Dwyer failed to establish a prima facie case of sexual harassment are not clearly erroneous within the meaning of Rule 52(a).
 
 
 17
 [W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.
 
 
 18
 Bessemer City, 470 U.S. at 575, 105 S.Ct. at 1512.
 
 B
 
 19
 Dwyer next contends that she is entitled to judgment on her claim of disparate impact. She argues that the police department's requirement that all officers, men and women, qualify with a twelve gauge shotgun by firing from the shoulder position produces a disparate impact on women. To establish a prima facie case Dwyer needed to prove by a preponderance of the evidence that the facially neutral requirement of shotgun qualification has a substantial disproportionate exclusionary impact on women. See Dothard v. Rawlinson, 433 U.S. 321, 328-30, 97 S.Ct. 2720, 2726-27, 53 L.Ed.2d 786 (1977). The district court concluded that she failed to satisfy this burden, and we agree.
 
 
 20
 As evidence of the requirement's disproportionate impact on women, Dwyer presented only testimonial evidence. Her orthopedic surgeon testified that women generally have smaller bone structure and less muscle mass than men, and that, because of these differences, women would be more prone to injury from the impact of the shotgun than would men. A firearms expert, who trains between 1000 and 1500 students per year, testified that, in his opinion,
 
 
 21
 [t]here is definitely a disparate impact upon the female in the shotgun training ..., because, first she has lighter upper body strength, lighter skeletal musculature in the upper body, and second because she tends to have a lower center of gravity [she] will be kicked around proportionately a great deal more than will a male officer by such a weapon.
 
 
 22
 To rebut Dwyer's evidence, the defendants offered a female Fairfax City police officer who said she had no trouble qualifying from the shoulder position and a District of Columbia police firearms instructor who testified that he had qualified hundreds of women without incident. On appeal, the defendants also point out that Dwyer's orthopedic surgeon testified that he could not definitively say whether men or women are more prone to injury, and that Dwyer's firearms expert was unable to cite a single instance in which a woman failed to qualify from the shoulder position.
 
 
 23
 Although we recognize that the evidentiary requirements of a prima facie case of disparate impact are not onerous, see Lynch v. Freeman, 817 F.2d 380, 388 (6th Cir.1987), we are convinced that even the minimal requirement was not met here. Dwyer's evidence only raises the possibility that women are being excluded disproportionately from employment with the police department. It does not tell us, for example, what "size" person is at significant risk of failure or injury by the shoulder-firing requirement, or what percentage of the "at-risk" group is comprised of women. Without this information, it is impossible to draw the necessary inference that the facially neutral qualification standard is producing a substantially disproportionate adverse impact on the protected class--women. The district court therefore correctly entered judgment for the defendants on the disparate impact claim. Compare Wright v. Olin Corp., 697 F.2d 1172, 1187 (4th Cir.1982) (concluding that the mere existence and operation of a fetal vulnerability program--which necessarily excluded all women and no men from certain job classifications because of potential for pregnancy--established as a matter of law a prima facie case).C
 
 
 24
 Dwyer also challenges the district court's judgment for the defendants on her Title VII claim of disparate treatment. She contends that she is entitled to a favorable judgment because the evidence shows that she was fired for several instances of "untruthfulness" but men who engaged in "similar or more egregious" behavior were not fired.
 
 
 25
 In Moore v. City of Charlotte, we laid out the appropriate method of establishing a case of disparate treatment:
 
 
 26
 First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by the preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.
 
 
 27
 754 F.2d 1100, 1104-05 (4th Cir.1985) (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)). We also reaffirmed that the plaintiff's initial burden is not onerous; the plaintiff need only "raise an inference" that the officials acted with discriminatory intent. Id.
 
 
 28
 In rejecting Dwyer's claim of disparate treatment, the district court properly applied the proof scheme. The court reasoned that
 
 
 29
 [Dwyer] failed to prove that she was qualified as a police officer as stated and her discharge was proper.
 
 
 30
 Had [she] adduced a prima facie case, this Court finds that the defendants have articulated a legitimate nondiscriminatory reason for its actions.
 
 
 31
 [Dwyer] was unable to effectively interact with members of the police department. She established a pattern of untruths and insubordination. [She] rejected her supervisor's efforts to provide constructive criticisms or suggestions and to adequately perform her duties as a police officer.
 
 
 32
 Therefore, according to the court, it was Dwyer's behavior, not her sex, that led to her dismissal. In light of all the evidence, we cannot say that the district court's determination is clearly erroneous. Dwyer cited isolated instances of misconduct of male officers, some admittedly more troublesome than any single incident of Dwyer's misconduct, but in the aggregate, her misconduct amounts to significantly more than any of the comparison cases. For example, Dwyer points to officers who lied to their supervisors, refused to answer questions during internal affairs investigations, or disobeyed direct orders, but only received written reprimands or no reprimands at all. Her misconduct, however, included lying to a superior about marking the tires of an illegally parked car, returning to the car to mark the tires later after being told not to return, misrepresenting the degree of probable cause for arrest to a magistrate who then erroneously issued an arrest warrant, failing to complete the requisite paperwork for her shoulder injury as directed, refusing to sign a "counseling form" which accompanied a counseling session for her misconduct, refusing to sign her annual evaluation, and accusing officers of sexual misconduct but refusing to provide adequate, substantiating details.
 
 
 33
 It is obvious upon the record that the district court's factual findings are "plausible in the light of the record viewed in its entirety," and therefore must be upheld. Bessemer City, 470 U.S. at 574, 105 S.Ct. at 1511.
 
 D
 
 34
 The district court's judgment for the defendants on Dwyer's Title VII claim of retaliatory discharge was also proper. An employee alleging retaliatory discharge must first establish a prima facie case by showing that (1) the employee engaged in protected activity; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between the protected activity and the adverse action. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985). "Once a prima facie case has been presented, the employer then has the burden of producing a legitimate nondiscriminatory reason for the adverse action, thereby rebutting the presumption of retaliation raised by the prima facie case." Id. Importantly, the employer is not required to prove the absence of retaliatory motive; it must only raise a genuine issue of material fact. Id. (citing Burdine, 450 U.S. at 254, 101 S.Ct. at 1094).[1]
 
 
 35
 Although the district court did not specifically delineate the various burdens associated with a claim of retaliatory discharge, it is clear that it applied them appropriately in making the ultimate determination that Dwyer was not terminated for filing her complaints. Assuming Dwyer established a prima facie case, the court found that it was adequately rebutted by the defendants' articulation of legitimate nondiscriminatory reasons for Dwyer's discharge. See Burdine, 450 U.S. at 255, 101 S.Ct. at 1094. The court explained that "[a]n employer--especially one providing law enforcement to the public--has the duty and obligation to discharge an employee who causes an adverse effect on employee morale and day-to-day functioning of his staff." Under the proper analysis, Dwyer then bore the burden of persuasion, requiring her to prove that the defendants' proffered reasons for the discharge were pretextual. As we held in Ross, "[f]or the employee to disprove a legitimate, nondiscriminatory explanation for adverse action, ... [s]he must show that the adverse action would not have occurred 'but for' the protected conduct." 759 F.2d at 365-66. We specifically rejected the view that "Title VII has been violated if retaliation for protected activity was merely 'in part' a reason for the adverse action." Id. at 366.
 
 
 36
 Dwyer failed to meet the strict "but for" requirement. The defendants offered many instances of misconduct that were unrelated to Dwyer's protected activity, and Dwyer failed to convince the district court that she would not have been discharged "but for" filing her EEOC complaints. Again, based on the entire record, the district court's determination is not clearly erroneous.[2]
 
 III
 
 37
 Dwyer also challenges the district court's dismissal of her several Sec. 1983 claims. At the close of her case, the court dismissed her claim for sexual harassment, finding it fatally duplicative of her Title VII claim, and directed verdict for the defendants on her first amendment claim, concluding that the evidence did not establish a violation.[3]A
 
 
 38
 In dismissing Dwyer's Sec. 1983 claim for sexual harassment, the court reasoned in effect that the Sec. 1983 claim was preempted by the parallel Title VII claim. In this the court erred.
 
 
 39
 In Keller v. Prince George's County, 827 F.2d 952 (4th Cir.1987), when faced with the identical question, we concluded that denying a plaintiff's demand for a jury trial of her Sec. 1983 claim because she was also litigating a parallel Title VII claim violated her seventh amendment right to a jury trial. Id. at 954-55. We also held, however, that the court's error in dismissing the Sec. 1983 claim would be harmless and could not serve as a ground for reversal if the trial judge properly could have directed a verdict in favor of the defendants on the Sec. 1983 claim. Id.
 
 
 40
 The district court's dismissal of Dwyer's Sec. 1983 claim would therefore be harmless error if the evidence were such that, without weighing the credibility of the witnesses, there was only one conclusion that a reasonable juror could have reached. Id. at 955. We conclude that this cannot be said here. As in Keller, we find it relevant that here too the district court did not grant an involuntary dismissal at the conclusion of plaintiff's evidence but decided the case in part at least on credibility grounds at the conclusion of all the evidence. See id. at 955. Given the evidence presented by Dwyer we cannot conclude that the defendants were entitled to a directed verdict on the Sec. 1983 claim as a matter of law, so as to make the erroneous dismissal harmless on that basis.
 
 
 41
 There remains another basis, however, for finding the court's technical error harmless and therefore affirming the dismissal. Under our precedents, even if we were to reverse on Dwyer's Sec. 1983 claim, a subsequent suit on this claim would be precluded by the doctrine of collateral estoppel. In Ritter v. Mount St. Mary's College, we held that even if the district court erroneously dismissed a claimant's legal claims, there under the Equal Pay Act and Age Discrimination in Employment Act, the court's findings of fact and judgment against the claimant in a fully-litigated Title VII action would preclude relitigation of these facts in any subsequent suit on the legal claims. 814 F.2d 986, 990-92 (4th Cir.1987).[4] Therefore, if the facts found in Dwyer's Title VII action are dispositive of her Sec. 1983 claim, she would in any event be precluded from litigating the claim further. That is the case here.
 
 
 42
 In holding for the defendants on Dwyer's Title VII sexual harassment claim, the district court found that Dwyer had failed to show that the actions complained of "altered the conditions of her employment, created an abusive working environment, or created a hostile working environment." In the Sec. 1983 action, any claim predicated on allegations of sexual harassment necessarily would require the same showing. Therefore, because the rule in this circuit is that "judge-determined issues ... stand as the facts of the case," Ritter, 814 F.2d at 991, Dwyer is collaterally estopped from further litigating her Sec. 1983 claim for sexual harassment. See id. at 992 (rejecting argument that "collateral" means the issues must arise in separate actions).
 
 B
 
 43
 Dwyer also contends that the district court erroneously directed verdict for the defendants on her first amendment claim. She specifically alleges that her memo of December 30, 1985 to Lt. Akers, in which she complained about particulars of the city firing range, was protected speech for which she was impermissibly disciplined. Her memo referred to the following matters: the lack of safety equipment at the range, the denial of adequate practice time and ammunition, the denial of the use of shoulder pads, the refusal of training assistance when she was recovering from her injury, and the refusal to consider "instinctive shot-gun shooting" which Dwyer alleged would help officers on the street. Her memo also included the specific difficulties she had firing the twelve gauge shotgun.
 
 
 44
 Dwyer identifies a letter from Lt. Akers in response to her December 30 memo as the impermissible adverse employment action that constitutes the first amendment violation. The letter reads in part:
 
 
 45
 Following these warnings ... I had ordered you to provide specific details to unsolicited allegations of neglect, [sic] of duty, malfeasance and failure to train.... You were to provide dates and other supportive details of these allegations by December 30, 1985. I assured you that I would have these matters pursued thoroughly and brought to the attention of the Chief ... with the inclusion of this simple supportive information giving the elemental framework of their occurrence. Your December 30th response failed to provide such information....
 
 
 46
 Lt. Akers' letter concludes with a notation that Dwyer's behavior was "unbecoming to a law officer" and an admonition against "making any accusations concerning other members of this department outside of proper established legal or regulatory procedure."
 
 
 47
 To avoid a directed verdict on her first amendment claim, Dwyer needed to establish a prima facie case of a violation, Gairola v. Virginia Dept. of Gen. Serv., 753 F.2d 1281, 1285 (4th Cir.1985), by showing that she engaged in protected speech or activity and that the speech or activity was a substantial factor in the resulting discipline. Mt. Healthy City Board of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); Jurgensen v. Fairfax County, 745 F.2d 868, 881 (4th Cir.1984). To determine whether a public employee's speech qualifies for first amendment protection, we consider (1) whether the speech qualifies as a matter of public concern and (2) what effect the speech has on the efficiency, discipline and proper administration of the workplace. Jurgensen, 745 F.2d at 879-80. The ultimate determination of whether the speech is constitutionally protected is a question of law for the court and should be arrived at after a consideration of the "content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 & n. 7, 103 S.Ct. 1684, 1690 & n. 7, 75 L.Ed.2d 708 (1983).
 
 
 48
 Because Dwyer failed to establish the first prong of the prima facie case, the district court properly directed verdict for the defendants on her first amendment claim. Although Dwyer's memo arguably touches upon matters of public concern--the conditions at the city firing range--the matters are only of "limited public interest ..., centering instead on matters primarily, if not exclusively, of 'personal interest.' " Jurgensen, 745 F.2d at 879-80. A careful reading of the memo, in light of the entire record, reveals that rather than bringing to public light a matter of general significance, Dwyer was voicing her personal grievances over having to qualify with the shotgun. She wrote a private letter to a superior that included a discussion of the personal difficulties she was having at the range. We agree with the district court that in total context, this communication fell on the private grievance rather than the public concern end of the speech spectrum.
 
 
 49
 Assuming, however, as it appears the district court may have, that Dwyer's memo at least touched upon matters of public concern, then the directed verdict for defendants was only proper if the reprimand was justified under the Pickering balance. Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968) (balance the employee's interests "as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees"). As the Supreme Court has recognized, "the State's burden in justifying [adverse employment action] varies depending upon the nature of the employee's expression." Connick, 461 U.S. at 150, 103 S.Ct. at 1692. The limited first amendment interest here does not require that Dwyer's employers tolerate associated behavior that they reasonably believed was disruptive and insubordinate. See id. at 154, 103 S.Ct. at 1693. The reprimand therefore was a permissible response to Dwyer's failure, when ordered by her superiors, to provide substantiating details of her allegations of harassment and discrimination.
 
 
 50
 Defendants argue alternatively that Dwyer is collaterally estopped from further litigating her first amendment claim by the district court's finding that no "retaliatory" actions were taken against Dwyer. See Ritter, 814 F.2d at 991. Because we have concluded that Dwyer failed to establish that she engaged in a protected activity for which she was impermissibly disciplined, we do not reach this issue.
 
 IV
 
 51
 Dwyer next contends that the district court erroneously directed verdict for the defendants on her pendent state claims of intentional infliction of emotional distress, defamation and a violation of Virginia's Insulting Words Statute, Va.Code Ann. Sec. 8.01-45.
 
 
 52
 * A threshold requirement of Virginia's tort of intentional infliction of emotional distress is a showing of "outrageous and intolerable" conduct that offends generally accepted standards of morality and decency. Gaiters v. Lynn, 831 F.2d 51, 53 (4th Cir.1987) (citing Womack v. Eldridge, 215 Va. 338, 210 S.E.2d 145, 148 (1974)). Whether the challenged conduct is sufficiently outrageous to sustain an action is a question of law for the court. Gaiters, 831 F.2d at 53. At the close of Dwyer's case, the district court held that Dwyer's allegations, even when viewed in the light most favorable to her, were not sufficiently outrageous, and directed verdict for defendants. This disposition was proper.
 
 
 53
 As noted above, in rejecting Dwyer's Title VII claim of sexual harassment, the district court properly found that the defendants' conduct--as established on the same conflicting evidence adduced by the parties on the claim of intentional infliction of emotional distress--did not create a "hostile or abusive work environment." Under our precedents, this determination now stands as the "facts" of the case. See Ritter, 814 F.2d at 991. It necessarily follows that the district court did not err as a matter of law in concluding that the same behavior was not sufficiently "outrageous" to sustain the action for intentional infliction of emotional distress. While we recognize that the two actions are dissimilar in many respects, it would defy reason to allow a claim for "outrageousness" of conduct to go forward when the district court has already determined that the factual predicate for such an action does not exist, that is, that the conduct complained of, in a full contextual analysis, was not sufficiently egregious to create an "abusive" or "hostile" environment. Cf. Moore v. Allied Chemical Corp., 480 F.Supp. 377 (E.D.Va.1979) (plaintiff collaterally estopped from relitigating factual issues which form the basis of his claim of intentional infliction of emotional distress).
 
 B
 
 54
 Count VII of Dwyer's complaint, labeled as "Insulting Words/Defamation," alleges that the defendants "uttered words which from their usual construction and common acceptance are construed as insults and tend to violence and breach of the peace and/or are defamatory." At trial and on appeal, however, perhaps from the confusion engendered by the multiple claims, Dwyer's arguments pertaining to the district court's disposition of Count VII relate solely to the insulting words claim.[5] Moreover, the record reflects that the district court's decision to grant the defendants' motion for directed verdict on Count VII is based only on a determination that the challenged statements are not actionable under the Insulting Words Statute. While it is reasonable, therefore, to assume that Dwyer has abandoned her defamation claim, in the interests of justice, we will discuss it briefly here.
 
 
 55
 Both claims are based on various writings among department employees, in which Dwyer is accused of being untruthful and perhaps guilty of perjury for lying to an investigating officer while under oath, and on an incident in which one officer called her a "liar" while they were on a public street. In Virginia, communications between persons with corresponding interests or duties, whether legal, moral or social, if made in good faith, are qualifiedly privileged. Great Coastal Express, Inc. v. Ellington, 230 Va. 142, 334 S.E.2d 846, 853 (1985). This qualified privilege can only be defeated in a defamation action upon "proof of common-law malice, that is, behavior actuated by motives of personal spite, or ill-will, independent of the occasion on which the communication was made." Gazette, Inc. v. Harris, 229 Va. 1, 325 S.E.2d 713, 727 (1985) (citing Story v. Norfolk-Portsmouth Newspaper, Inc., 202 Va. 588, 118 S.E.2d 668, 670 (1961)). Viewing the evidence in the light most favorable to Dwyer, it is clear that a reasonable juror could only conclude that the defendants were not acting with actual malice. See Keller v. Prince George's County, 827 F.2d 952, 955 (4th Cir.1987). Most of the written communications followed careful investigations by the department which were prompted by Dwyer herself. The allegations of her untruthfulness and possible perjury were worded as opinions and were substantiated by specifics. Additionally, the communications were limited to the appropriate personnel, further indicating a lack of actual malice. While determinations of ill-will and common-law malice in defamation actions are generally made by the jury, it was proper for the court to direct a verdict because there was no evidence in the record to support the necessary contrary conclusion. Richmond Television Corp. v. United States, 354 F.2d 410, 414 (4th Cir.1965).
 
 
 56
 We also reject Dwyer's allegation in her complaint that it was defamatory to call her a "liar" while standing on a public street. It is essential in a defamation action to show "publication" of a false statement. Dwyer has failed to show that anyone overheard the defendant's remark.
 
 
 57
 Virginia's Insulting Words Statute provides that "[a]ll words shall be actionable which from their usual construction and common acceptance are construed as insults and tend to violence and breach of the peace." Va.Code Ann. Sec. 8.01-45. "Although application of this provision is no longer confined to its original purpose of preventing duels, it has been interpreted by Virginia courts to be virtually co-extensive with the common law action for defamation." Potomac Valve & Fitting, Inc. v. Crawford Fitting Co., 829 F.2d 1280, 1284 (4th Cir.1987). In many cases then, defamation claims and claims brought under Sec. 8.01-45 "must ineluctably 'rise or fall together.' " Id. We are satisfied that this is one of the cases. In directing verdict for the defendants on Dwyer's claim brought under Sec. 8.01-45, the court conceded that imputation of a crime is actionable under the provision, see Zayre of Virginia, Inc. v. Gowdy, 207 Va. 47, 147 S.E.2d 710, 713 (1966), but found that a lone accusation of the commission of perjury and the other statements concerning Dwyer's untruthfulness, which were "all part of an ongoing process with an employe through several steps of hearings and reprimands," are not actionable. In other words, the challenged writings and the statement made on the street, even though insulting in nature, were acceptable in the context of the investigations and, in any event, were not delivered in a manner that would "tend to violence and breach of the peace." We agree. Directing verdict for the defendants on both the defamation and insulting words claims was therefore proper.
 
 V
 
 58
 Dwyer's final challenge to the district court's treatment of her case also fails. Dwyer claims that the court erroneously excluded certain properly offered evidence pertaining to her claim of sexual harassment--evidence of attitudes and incidents unrelated to Dwyer but suggestive of a pervasive atmosphere of sexual discrimination--and her claim of retaliation--evidence of male officers' unchecked transgressions. The defendants contend that much of this evidence was rightly excluded because Dwyer had not indicated during discovery that certain witnesses would be called or because she failed to proffer the evidence appropriately so that the judge could rule on its admissibility. Without resolving this basic dispute between Dwyer's and the defendants' view of the manner in which the evidence was offered, and without determining whether the challenged rulings involved technical error, we conclude, after a careful review of the record, that any error that may have occurred by the evidentiary exclusions was harmless and therefore does not require reversal. See Fed.R.Civ.P. 61.
 
 
 59
 AFFIRMED.
 
 
 
 [1]
 Dwyer contends that once she proves by "direct evidence that unlawful discrimination was a motivating factor in the employment decision" the defendant must prove "that the same decision would have been made absent the determination." Appellant's Brief at 25 (quoting Fields v. Clark University, 817 F.2d 931, 937 (1st Cir.1987)). This shifts the burden of persuasion to the defendant contrary to Burdine. The Fields court recognized its departure from the Supreme Court's holding, but determined that "the logic of such an approach is inescapable [because] the employer is in the best position to prove which of its motives was determinative." Fields, 817 F.2d at 936. While this is facially appealing, it is counter to the Burdine Court's determination that leaving the burden of persuasion on the plaintiff throughout the retaliation proof scheme was not unduly burdensome. Burdine, 450 U.S. at 258, 101 S.Ct. at 1096
 
 
 [2]
 In its ruling from the bench, the district court erroneously stated that there was no evidence of retaliation in the case. Dwyer contends that this statement alone mandates reversal. We reject this view in light of the court's more careful treatment in its findings of fact and conclusions of law
 
 
 [3]
 There is some confusion in the parties' briefs and the trial transcript concerning the precise nature of Dwyer's remaining Sec. 1983 claims. Because the district court's discussion concerning the dismissal of the Sec. 1983 claims on "preemption" grounds focuses on Dwyer's sexual harassment claim, and because Dwyer's brief only challenges the court's finding of preemption and its disposition of her first amendment claim, we limit our analysis to these two claims. Additionally, although Dwyer seems to treat her first amendment claim independently of Sec. 1983, we treat the claim as one brought under Sec. 1983 to vindicate a first amendment right
 The court also dismissed Dwyer's Sec. 1983 claim alleging that the defendants failed to supervise or properly train her, determining that it was no more than a simple negligence action which did not arise to constitutional dimensions. Dwyer does not appeal this here.
 
 
 [4]
 We are aware that later decisions in other circuits disagree with our preclusion position in Ritter. See, e.g., Volk v. Coler, 845 F.2d 1422, 1437 (7th Cir.1988) (erroneously dismissed Sec. 1981 race discrimination claim not precluded by adverse findings in parallel, joined Title VII claim; seventh amendment instead requires vacatur of Title VII judgment pending jury verdict on reinstated Sec. 1981 claim and preclusion of common issues by that verdict); Roebuck v. Drexel University, 852 F.2d 715, 737-39 (3d Cir.1988) (same, where district court had erroneously granted judgment n.o.v. but properly ordered new trial of successfully prosecuted Sec. 1981 claim after finding against claimant on parallel Title VII claim; Title VII judgment vacated pending jury verdict on retried Sec. 1981 claim, that verdict then to be preclusive). See also Wade v. Orange County Sheriff's Office, 844 F.2d 951, 954-55 (2d Cir.1988) (where jury found for claimant on Sec. 1981 claim and judge found for defendant on parallel Title VII claim, jury verdict preclusive on common issues; despite inconsistent findings defendant not entitled to new trial on Sec. 1981 claim)
 We also note that in Swentek v. USAIR, Inc., 830 F.2d 552 (4th Cir.1987), decided after Ritter, we recognized (1) that the general rule, at odds with Ritter, "encouraged" deference by bench trial judges to jury verdicts on common issues in properly joined parallel claims, id. at 559; (2) that this rule was not, however, "ironclad," citing Ritter, and should yield to Ritter 's counter-rule of primacy for prior bench trial findings under the circumstances of that case, id.; but (3) that neither was Ritter 's rule absolute, and that in the interest of "fairness," it should not be applied under the "narrow circumstances" presented in Swentek so as to require a judge who had ordered a new trial on a successfully prosecuted state tort jury claim to set that new trial at naught by giving preclusive effect to his extant bench trial findings against claimant in a parallel Title VII claim. Id. at 562-63.
 With all respect therefore to our sister circuits' conflicting views and with due regard for Swentek 's distinction of its circumstances from those in Ritter, Ritter 's preclusion rule remains directly controlling and binding panel precedent in this circuit under the circumstances there and here at issue: erroneous dismissal of jury claim before verdict, followed by bench trial findings against claimant on common, dispositive issues.
 
 
 [5]
 While Dwyer's appellate brief baldly states that the district court erred in "dismissing Dwyer's claims for insulting words and defamation," her supporting argument is limited solely to countering the court's findings related to the insulting words claim