For the reasons stated in the Court's opinion of this date;

**ORDERED** that TEXACO's Motion for Partial Summary Judgment is **DENIED;** and it is **FURTHER ORDERED THAT** CIGNA's Motion for Summary Judgment is **DENIED.**

**Jacqueline NAYLOR, Plaintiff,**

v.

**CITY OF BOWIE, MARYLAND, Defendant.**

**No. Civ. H–99–292.**

United States District Court, D. Maryland.

Dec. 9, 1999.

Laura E. Jordan, Washington, DC, for Plaintiff.

Richard T. Colaresi, Northrop, Walsh, Becker, Colaresi & Spears, Bowie, MD, for Defendant.

## MEMORANDUM OPINION

ALEXANDER HARVEY, II, Senior District Judge.

Plaintiff Jacqueline Naylor ("Naylor") is presently employed as a laborer by defendant City of Bowie, Maryland ("Bowie"). In this civil action, plaintiff has sued her employer under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* In Count I of the complaint, plaintiff has alleged a claim of hostile environment sexual harassment. In Count II, she claims that defendant Bowie failed to take proper remedial measures to deter the harassment experienced by her. Federal question jurisdiction exists under 28 U.S.C. § 1331.

Pursuant to Scheduling Orders entered by the Court, the parties have engaged in extensive discovery. Pending before the Court is a motion for summary judgment filed by defendant Bowie. The parties have submitted lengthy memoranda and numerous exhibits in support of and in opposition to the pending motion, including affidavits and excerpts from depositions taken during discovery. A hearing on the pending motion has been held in open court. For the reasons stated herein, defendant's motion for summary judgment will be granted.

### I

#### Background Facts[1]

On August 30, 1995, Naylor was hired by Bowie to work as a laborer at Bowie's Wastewater Treatment Plant (the "Plant").[2] As the only female employee at the Plant, Naylor was given her own

---

**1.** Because plaintiff is the non-movant here, the facts summarized below, where disputed, reflect plaintiff's version of the events to the extent that it is supported by affidavits, depositions or documentary evidence. *Magnuson* *v. Peak Technical Servs., Inc.,* 808 F.Supp. 500, 504 (E.D.Va.1992).

**2.** Some 10 or 11 persons work at the Plant.

changing room which included a restroom (the "Bathroom") Naylor's immediate supervisor was Joseph Schneider ("Schneider"), the Plant Superintendent. Schneider has worked for Bowie for 35 years. Until June 2, 1998, Schneider was responsible for completing Naylor's employee performance evaluations. Naylor was satisfied with all of Schneider's evaluations of her, and she has testified that he rated her fairly.

On November 3, 1997, Naylor's husband passed away. Naylor was and continues to be profoundly affected by the loss of her husband. Naylor nevertheless worked her regular shifts at the Plant beginning soon after her husband's death. She would often have crying spells in the middle of her shift as the result of the grief she felt, and she attended a grief counseling group for several months. In November of 1997, right after her husband's death, Naylor began taking Prozac, an anti-depressant drug, to help her better cope with the depression she felt after her loss. She had never taken Prozac before.[3]

In her deposition testimony, Naylor identified some twenty-four incidents beginning in early 1997 but intensifying in regularity from November 1997 through May 1998 which she claims support her allegations of sexual harassment. The first two of these incidents occurred sometime before November 1997. Naylor states that on two occasions when she was cleaning a piece of machinery and when she was working in a Bathroom stall, Schneider approached her from behind and commented that he "loved" to watch her work. On another occasion while watching her work, he said that "he wished he could take her home."

After the death of Naylor's husband, she believes that Schneider and other co-workers of Naylor came to her house to deliver some food. According to Naylor, there was nothing significant about this contact with Schneider. In December 1997, Schneider asked Naylor to meet with him

in private in the conference room at the Plant, where he gave her a Christmas Card with a $50 bill inside. He requested that she not tell anyone about this gift. Naylor accepted the gift, but claims that it made her "uncomfortable" because it occurred "behind closed doors." Schneider also touched Naylor during this encounter, but according to Naylor, only "to put his hand like on my shoulder, you know, to like confide in me like oh, have a Merry Christmas and I got this for you ..." Naylor subsequently tore up the card outside of Schneider's presence, but she used the money to buy a Christmas gift for a friend.

In January 1998, Naylor and Schneider made arrangements for Schneider to come to her house during working hours one day to try and repair her broken furnace. They traveled in separate cars to Naylor's house. While Schneider was at the house, Naylor's daughter was present. Unable to fix the furnace, Schneider drove back to the Plant, retrieved two space heaters, and delivered the space heaters to Naylor at the front door of her house. Naylor ensured that her daughter was present the entire time because she felt "uncomfortable" about Schneider coming to her house. According to Naylor, there was no objectionable behavior engaged in by Schneider during that visit.

Around Valentine's Day in February 1998, Schneider gave Naylor a Valentine's Day card with a $50 bill inserted in a money holder inside the card. This exchange occurred in private in the conference room at the Plant. Naylor kept both the card and the money and did not object or express any reservation about this behavior to Schneider, although she believed that "there was something going on that was not right."

Sometime in April 1998, Schneider requested that Naylor accompany him in a walk down to the woods on the Plant grounds and check the fence line near the

**3.** Her doctor also has prescribed sleeping pills for her.

lake for holes. During this walk, they talked about "life, [Schneider's] childhood, about anything in life" for fifteen minutes and then returned to the Plant. There were no inappropriate comments made by Schneider during this trip nor was there physical contact of any sort. However, Naylor testified that she felt "uncomfortable" because she was the only employee at the Plant "asked [by Schneider] to go do that."

During April 1998, Schneider left for Naylor in her Bathroom a multipack of microwave popcorn which Schneider knew Naylor liked. Naylor threw the popcorn away when she discovered that it was from Schneider. Naylor did not at the time or thereafter tell him to stop giving her gifts or leaving them for her in her Bathroom. Prior to late May of 1998, Naylor never complained to Schneider or to any Bowie officials about Schneider's behavior or about any of the incidents which she now characterizes as having made her feel uncomfortable.

Sometime around April or May 1998, Schneider gave Naylor $50 to buy a new pair of work shoes because he said that her "work shoes were falling apart." Naylor kept the money but did not use it to buy shoes. She stated that she found Schneider's conduct with regards to this exchange to be objectionable because it was "strange" and "uncomfortable."

During this same period, Schneider on one occasion invited Naylor to meet him at a local Mobil gas station in her car so he could fill up her gas tank using his new Mobil Speedpass. Naylor told Schneider that she did not need gas, and she did not meet him at the gas station. Schneider later told Naylor that he had gone to the gas station anyway and had waited for her for about 30 to 45 minutes. Naylor responded by stating that she had already told him that she was not going to come. Schneider spoke to Naylor about this in a "calm, regular conversational tone" and took no adverse employment action against Naylor for not having met him. Naylor

found Schneider's request to meet her at the gas station objectionable because it was "strange."

During April or May of 1998, Schneider gave Naylor a box of peanut-butter cookies, wrapped in a taped blue rag. Shortly thereafter, Schneider left a bottle of Canadian Club liquor on the front seat of Naylor's car as a gift. Naylor accepted both of these gifts without objection.

During this same period, Naylor found a tub of candies in her Bathroom which Schneider had left for her. Naylor subsequently threw the candies in the trash. While Naylor found this conduct objectionable because Schneider had "been in [her] Bathroom," she did not then complain to him or any Bowie officials about this behavior. At a later date, Schneider left a large container of Lifesaver candies in Naylor's Bathroom after she had been out sick from work. The note attached to the candies stated that Schneider was "sorry" she had been out sick and that he hoped she was feeling better.

On an occasion in April or May of 1998, Naylor and Schneider went on a another trip to inspect the fence. During this trip, Schneider gave Naylor a white envelope containing $50, which she kept. No objectionable conduct or improper physical contact occurred on this trip.

In May 1998, Naylor cleaned out her garage at home and brought into work some containers of oil to be disposed of at the Bowie recycling center which was located a short distance from the Plant. Although Naylor told Schneider that she did not need assistance with this task, he accompanied her anyway in her car on the trip to the center. When Naylor attempted to start her car to drive back to the Plant, Schneider requested that she "stop and sit here for a minute," an invitation which Naylor did not refuse. Schneider then gave her a card with a note stating "extra pay for special person" and $250 inside. Schneider then stated to Naylor that "I don't want you to think that this

money is to get into your pants," after which Schneider turned his head and mumbled "but I certainly wouldn't mind." Naylor did not respond in any way to this inappropriate comment. After this exchange, Naylor and Schneider drove back to the Plant, and Schneider left the car and "went about his business." Naylor kept both the card and the money.

Naylor also received a box of cherry candies from Schneider in May of 1998. Naylor is not sure whether he left the candies for her in her Bathroom or whether he gave them to her on a trip to a nearby cemetery. The trip to the cemetery involved a visit by the two to the Sacred Heart Cemetery where relatives of Schneider were buried. She agreed to accompany him and believes that she may have indicated to him that it might be "neat" or "nice" to see the cemetery. During this visit, Schneider pointed out to Naylor his family plots, and they discussed Schneider's life. No objectionable conduct occurred during this trip. However, Naylor testified that underneath this box of candies which she had received either in the Bathroom or at the cemetery, Schneider had left a wrapped condom which she later discovered.

In late May 1998, Schneider and Naylor took another trip to inspect the fence. According to Naylor, this was a trip when "everything happened." During the trip, Schneider placed his hand on Naylor's shoulder, neckline and back, and he left his hand on her back while they talked about subjects ranging from Schneider's family to Naylor's deceased husband. She did not ask him to remove his hand from her back. At no point during this trip or immediately thereafter did Naylor express any objection to Schneider or to any Bowie officials about this physical contact with Schneider. However, Naylor has testified that had she been in her right state of mind, "[she] would have punched him in the face and kicked him in the balls."

Naylor described her state of mind at the time as "functional" and stated that she knew the contact was "hurting her inside" and making her "uncomfortable."

Even later in May 1998, Naylor and Schneider began to take another trip to inspect the fence, but shortly into the trip Schneider was called back to the Plant to receive a phone call from his wife. Schneider was upset that their "time to go into the woods and walk" had been interrupted. Naylor has acknowledged that she never refused to accompany Schneider on this or any of the other inspection trips.

On May 28, 1998, Schneider gave Naylor a computer generated card which stated "Priority Position of Special Friend." Prior to having received this card, Naylor and another co-worker had created a list documenting the co-workers whom each "like[d] the most" in order of preference.[4] Schneider had apparently managed to get a copy of this list, and he discovered that he was listed eighth on Naylor's list. He told Naylor that he wanted to be number one on her list and showed her that, on his copy of the list, he had crossed out the name of the person she had listed as number one.

On a date near Naylor's birthday, on or around the May, 1998 Memorial Day weekend, Schneider left an ink pen for Naylor in her car which was stuffed in a rag as a gift. Naylor opened the gift in front of two co-workers. The gift was accompanied by a card which read, "Happy Birthday from Friend # 8." Naylor was upset and embarrassed by this gift.

On May 29, 1998, Schneider again met with Naylor in private in the Plant conference room at his request where he gave her a card with a $50 bill inside which read "[w]hich would you rather have, a little love or a little money, how about a little of each?" Later, Schneider specifically asked Naylor "which one do you want, the love or the money?", at which point Naylor

---

**4.** Counsel for plaintiff contends that Schneider prepared this list. However, Naylor has testified that she and a co-worker authored the list.

pushed the card back into Schneider's chest and told him she did not want or need his love, his money, or anything from him. When Schneider insisted that she keep the card and money, she shoved them in her pocket, left the conference room and began to cry. Shortly thereafter, Naylor went back to work and continued her duties.

Some four days later, Naylor's father reported Schneider's conduct to David Deutsch, Bowie's City Manager. The day after such alleged harassment was reported to Bowie's City Manager, Naylor met with John Clinton ("Clinton"), a Bowie official, and specifically complained about many of the incidents in question.[5] Bowie had a sexual harassment policy in effect during the period in question which was outlined in the employee handbook. It was clear from this stated policy that Bowie had adopted a no tolerance position with regard to sexual harassment.

Clinton was interested in remedying the situation and assured Naylor that she would not lose her job. Clinton further indicated that he would interview some of her co-workers about her complaint and then contact her with the results of his investigation.

On June 5, 1998, three days after Clinton's meeting with Naylor, Clinton sent a letter to Schneider which informed him that his behavior towards Naylor was unacceptable. The letter outlined in some detail the actions which Bowie would be taking against Schneider as the result of the complaint and Bowie's subsequent investigation. Schneider was told that Naylor had been instructed to report to Clinton any recurrence of Schneider's conduct and that severe discipline would be administered if the conduct continued. Schneider was ordered (1) to stop at once all of the conduct to which Naylor had objected; (2) to immediately cease any supervision over

Naylor; (3) to not socialize or have any social interaction with Naylor in or outside the workplace; and (4) to in no way retaliate against Naylor for having made her complaint.

Naylor has acknowledged that, after she filed her complaint in early June of 1998, the behavior to which she objected ceased altogether. Naylor has further admitted that since her complaint, she has been supervised by another Bowie employee.[6] For the most part, Schneider has not even been present in the administrative building in the Plant when Naylor has been undertaking her cleaning duties. During her deposition, Naylor indicated that she found it "hysterical" that Schneider would on occasion leave a building or room in which she was present or would change his direction upon seeing Naylor. Nevertheless, Naylor complained in September of 1998 that Schneider had recently been becoming more visible to her at the Plant. Bowie officials then changed Schneider's work schedule so as to ensure that Naylor and Schneider would not have any contact with each other whatsoever.

Naylor filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") on October 22, 1998. On November 5, 1998, the EEOC issued to Naylor a "Right to Sue" letter. Naylor subsequently filed this civil action in this Court on February 3, 1999.

## II

### Summary Judgment Principles

It is well established that a defendant moving for summary judgment bears the burden of showing the absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law. *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir.1984). Where, as here, the nonmoving party will bear the ultimate

---

5. Naylor did not tell Clinton about several of the incidents which she now relies upon as support for her claim of sexual harassment.

6. Assistant Superintendent William Kreitzer became Naylor's immediate supervisor in early June of 1998.

burden of persuasion at trial, "the burden on the moving party [at the summary judgment stage] may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

One of the purposes of Rule 56 of the Federal Rules of Civil Procedure is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed and properly supported, to come forward with some minimal facts to show that the defendant may be liable under the claims alleged. *See* F.R.Civ.P. 56(e). If the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then "the plain language of Rule 56(c) mandates the entry of summary judgment." *Catrett*, 477 U.S. at 323, 106 S.Ct. 2548.

While the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the party opposing the motion, *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985), "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). " 'A mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.' " *Barwick*, 736 F.2d at 958–59 (quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C.1966), *aff'd*, 388 F.2d 987 (4th Cir.1967), *cert. denied*, 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153 (1968)). Moreover, only disputed issues of *material* fact, determined by reference to the applicable substantive law, will preclude the entry of summary judgment. "Factual disputes that are irrelevant or unnecessary will not be count-

ed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In the absence of the necessary minimal showing by the plaintiff that the defendant may be liable under the claims alleged, the defendant should not be required to undergo the considerable expense of preparing for and participating in a trial. *See Catrett*, 477 U.S. at 323–24, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505. Indeed, the Fourth Circuit has stated that, with regard to motions for summary judgment, the district courts have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (quoting *Catrett*, 477 U.S. at 323–24, 106 S.Ct. 2548).

Applying these principles to the facts of record here, this Court has concluded that defendant's motion for summary judgment must be granted as to both Title VII claims asserted by plaintiff in this case.

### III

#### Applicable Law

■ In Count I of her complaint, plaintiff has asserted a claim of hostile environment sexual harassment pursuant to *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 62, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). *See also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. Boca Raton*, 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). To sustain a claim of hostile work environment sexual harassment under Title VII, a plaintiff must produce sufficient evidence establishing (1) that the conduct alleged was unwelcome; (2) that it was based on her sex; (3) that it was sufficiently severe or pervasive to alter her conditions of employment and to create an abusive or hostile work environment; and (4) that it was imputable on some factual basis to her employer. *See Spicer v. Commonwealth Of Virginia*,

*Dept. of Corrections,* 66 F.3d 705, 710 (4th Cir.1995) (*en banc*); *cf. Scannell v. Bel Air Police Dept.,* 968 F.Supp. 1059, 1063 (D.Md.1997) (Davis, J.).

■ In *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court held that in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive and one that the victim in fact did perceive to be so. *Id.* at 21–22, 114 S.Ct. 367. To determine whether an employer's alleged conduct was sufficiently severe or pervasive to bring it within the proscription of Title VII, a court must examine "all the circumstances, [including] the frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Beardsley v. Webb,* 30 F.3d 524, 529 (4th Cir.1994) (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367).

■ Title VII does not prohibit "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). The prohibition of harassment on the basis of sex forbids only "behavior so objectively offensive" as to alter the terms or conditions of the victim's employment. *Id.* at 80, 81, 118 S.Ct. 998. The conduct of an employer which is "not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Id.* at 81, 118 S.Ct. 998 (citing *Harris,* 510 U.S. at 21, 114 S.Ct. 367). The Supreme Court has always regarded this requirement as crucial and sufficient to "ensure that courts and juries do not mistake ordinary socializing in the workplace—such as

... intersexual flirtation—for discriminatory conditions of employment." *Oncale,* 523 U.S. at 81, 118 S.Ct. 998. Both the Fourth Circuit and this Court have dismissed sexual harassment claims where the alleged harassment was insufficiently severe or pervasive to affect a term or condition of a plaintiff's employment. *See e.g., Dwyer v. Smith,* 867 F.2d 184, 187 (4th Cir.1989); *Francis v. Bd. of School Comm'rs of Baltimore City,* 32 F.Supp.2d 316, 320, 325 (D.Md.1999); *Raley v. Board of St. Mary's County Comm'rs,* 752 F.Supp. 1272, 1280 (D.Md.1990).

### IV

#### *Discussion*

##### (a)

##### *Count I*

■ When the material facts of record pertaining to Count I are considered in their entirety, this Court concludes that the conduct of Schneider was not sufficiently severe or pervasive to support a claim of hostile work environment sexual harassment under Title VII. All of the circumstances must be examined. *Harris,* 510 U.S. at 23, 114 S.Ct. 367. The Court has recounted in detail the many incidents relied upon by plaintiff because of her argument that Schneider's objectionable conduct was frequent and pervasive. Indeed, plaintiff has testified to a laundry list of incidents which occurred between September of 1997 and June of 1998 and which she argues constituted sexual harassment. Whether considered separately or in combination, the incidents in question are not so severe and pervasive to satisfy plaintiff's burden of proof in this case.

The vast majority of the incidents in question were innocuous occurrences between a man and a woman interacting during the course of their employment. *Oncale,* 523 U.S. at 81, 118 S.Ct. 998. Naylor characterized many of Schneider's acts as being "strange," and she has testified that she felt merely "uncomfortable."

Only a few of the challenged acts had a sexual connotation. Certainly, it was offensive conduct when Schneider offhandedly mentioned that he "wouldn't mind" getting "into your pants" and when he left a condom underneath a box of candies which he gave to her. However, these isolated "offensive" occurrences did not rise to the level of being sufficiently severe and pervasive to create an objectively hostile or abusive work environment. *Harris,* 510 U.S. at 21, 23, 114 S.Ct. 367.

Plaintiff argues that Schneider purposely took advantage of her fragile emotional condition caused by the death of her husband. But co-workers as well as Schneider gave her money and presents after her husband's death in efforts to lessen her grief.

At no time was Schneider's conduct physically threatening or humiliating. There were no attempts on his part to kiss her or to physically force himself upon her in a sexual encounter. He never requested that they engage in sexual relations, nor did he threaten her with the loss of her job if she did not comply with such a demand. In characterizing his conduct as "strange" and her feelings as "uncomfortable," Naylor has not shown that she was humiliated by what Schneider did. Indeed, she did not return to him any of the money which he gave her from time to time, and she did not tell him that his conduct was unwelcome until late May.

Although plaintiff has testified that she was fearful of losing her job, evidence that he actually threatened her with such a loss is meager and insubstantial. On one occasion, he indicated that she might lose her job if she mentioned that her timecard had been falsified by him. She had only a vague recollection of the one other such occasion mentioned during her deposition testimony. She could not remember the time frame when he might have told her that she would lose her job if she told Schneider's wife and kids that he was giving her money and cards. She believed it may have been in early June in the Plant conference room. But, there is no evidence in the record here that Schneider ever told plaintiff that she would lose her job if she did not consent to a sexual encounter.

Moreover, evidence of record does not exist indicating that Schneider's challenged conduct unreasonably interfered with Naylor's work performance. Throughout the period of time in question, Naylor has continued to perform her employment duties in a satisfactory manner. She has received annual increases in her pay, and she has testified that Schneider has rated her fairly. There is no proof that the alleged harassment significantly affected Naylor's psychological well-being. *See Harris,* 510 U.S. at 23, 114 S.Ct. 367. Naylor was indeed grief stricken as a result of her husband's death in November of 1997, and her crying spells during the next six months were expressions of her profound grief.

In sum, the Court concludes as a matter of law that the behavior of her supervisor Schneider, challenged by plaintiff in this case, was not so objectively offensive as to alter the terms or conditions of Naylor's employment. *Oncale,* 523 U.S. at 81, 118 S.Ct. 998. What occurred here was no more than "intersexual flirtation" which, as noted by the Supreme Court in *Oncale,* should be considered a part of ordinary socializing in the workplace and not a discriminatory condition of employment. *Id.* at 81, 118 S.Ct. 998. Undoubtedly, plaintiff subjectively found Schneider's conduct to be annoying and offensive. But much more must be proved to satisfy the Title VII requirement that the conduct in question, when viewed objectively, amounted to sexual harassment. As the Supreme Court noted in *Oncale,* Title VII is not "a general civility code." *Id.* Because of the recent death of her husband, Naylor was unreasonably sensitive to interaction with Schneider occurring in her working environment.

Facts of record in this case involve conduct much less severe than that found by the Fourth Circuit and this Court as not being sufficient to sustain a Title VII claim of hostile work environment sexual harassment. *See Dwyer,* 867 F.2d at 187 (affirming directed verdict in favor of defendant because plaintiff's complaints that she was subjected to pornographic material in her mailbox, was accused of having sex with other workers, and was subject to sexually explicit conversations was not sufficiently severe or pervasive); *Raley,* 752 F.Supp. at 1272 (granting summary judgment for defendant because the actions complained of, consisting of isolated incidents of offensive touching and sexual innuendos, were not sufficiently severe); and *Raley,* 752 F.Supp. at 1280 (granting summary judgment for defendant in spite of plaintiff's claims that her supervisor requested sexual favors from her in return for a promotion, repeatedly accused her of having a sexual relationship with her former supervisor, commented on her body on one occasion, including the shape of her legs and waist, and squeezed her waist on one occasion).

For all these reasons, defendant is entitled to the entry of summary judgment in its favor as to Count I.[7]

### (b)

### *Count II*

In Count II of the complaint, plaintiff has alleged that defendant Bowie failed to take proper remedial measures to deter Schneider's sexual harassment after it was informed that a workplace harassment situation existed. For several reasons, this Court concludes that there is no merit to the claim alleged by plaintiff in Count II.

First, plaintiff's Count II claim must fail because this Court has concluded as a matter of law that the alleged sexual harassment was not sufficiently severe or pervasive to sustain plaintiff's Title VII claim. In the absence of facts indicating a violation of Title VII, defendant Bowie had no duty to undertake proper remedial measures.

■ In any event, plaintiff has the burden under Count II of proving, as alleged, that defendant failed to take proper remedial measures when it learned that a workplace harassment situation existed. It is therefore not necessary for defendant Bowie, in responding to Count II, to raise the affirmative defense to liability, outlined in *Faragher. See* 524 U.S. at 807, 118 S.Ct. 2275. Rather, plaintiff has the burden of proving all the elements of the claim alleged in Count II. On the record here, the Court is satisfied as a matter of law that plaintiff has not met this burden.

■ Defendant Bowie had no knowledge of the conduct challenged by plaintiff until her father contacted Bowie's City Manager in early June of 1998. Although conceding that the City acted promptly, plaintiff contends that the measures taken by it did not correct his objectionable behavior. The Court must disagree.

Schneider was removed as plaintiff's supervisor on June 5, 1998 and had no direct contact with her thereafter. Naylor even found it amusing that Schneider would leave a building or room in which she was present or change his direction whenever he saw her. Nevertheless, Naylor complained to Clinton in September or October that Schneider was not complying with the June 5 letter because he was not keeping as much distance between the two as earlier. Clinton investigated the matter and found no inappropriate behavior on the part of Schneider. There is no evi-

---

7. No tangible adverse employment action was taken in this case against plaintiff Naylor. In defending the claim asserted by plaintiff in Count I, defendant Bowie has accordingly raised the affirmative defense recognized by the Supreme Court in *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275. However, since the Court has concluded that here is no merit to the claim of hostile work environment sexual harassment alleged by plaintiff in Count I, it is not necessary to address the affirmative defense available to defendant Bowie under the circumstances here. *See Francis,* 32 F.Supp.2d 316, 324 n. 7.

dence here of any conduct or statements of Schneider which occurred after early June and which could in any way be considered as amounting to sexual harassment. The mere fact that Schneider at times became "more visible" to Naylor hardly amounts to improper conduct on his part.

Accordingly, defendant Bowie is also entitled to summary judgment as to Count II of the complaint.

## IV

### *Conclusion*

For all the reasons stated, the motion for summary judgment of defendant Bowie will be granted. An appropriate Order will be entered by the Court.