Alvin COATES; Stephanie Benefield, Plaintiffs–Appellees,

v.

Timothy DAUGHERTY; Chester L. Toney, Defendants–Appellants,

and

Lisa A. Janiszewki, Defendant.

No. 91–1659.

United States Court of Appeals, Fourth Circuit.

Argued March 3, 1992.

Decided Aug. 18, 1992.

Peter Donald Andreoli, Jr., Sr. Asst. County Atty., Fairfax, Va., argued (Robert Lyndon Howell, Acting County Atty., on brief), for defendants-appellants.

David Barr Albo, Albo & Anderson, Vienna, Va., argued for plaintiffs-appellees.

Before ERVIN, Chief Judge, PHILLIPS, Circuit Judge, and RAMSEY, Senior United States District Judge for the District of Maryland, sitting by designation.

## OPINION

ERVIN, Chief Judge:

Alvin Coates and Stephanie Benefield filed an action in the Eastern District of Virginia alleging that two Fairfax County police officers, Timothy Daugherty and Chester Toney, Jr., violated their constitutional rights under 42 U.S.C. § 1983 by wrongly arresting them for shoplifting. Both parties consented to trial before a magistrate judge. The officers did not move for summary judgment. After trial, the magistrate judge instructed the jury on Daugherty's and Toney's qualified immunity defense, and the jury returned a verdict for the plaintiffs, awarding them jointly $1,000 from each officer as compensatory damages and awarding no punitive damages. The officers moved the magistrate judge to enter judgment notwithstanding the verdict (JNOV) because the facts required a finding that the officers had probable cause to arrest or, alternatively, the officers were entitled to qualified immunity. The magistrate judge refused the request and entered judgment on behalf of Coates and Benefield. Daugherty and Toney appeal, and we affirm.

## I.

Benefield and Coates were doing last-minute Christmas shopping for Benefield's daughter at the Springfield Mall in Fairfax, Virginia on the evening of December 22, 1989. Coates and the manager of Georgetown Leather Design got into an argument about a leather coat and whether it would ever go on sale. The manager called a mall security officer, who asked Coates to leave the store. The mall security officer contacted Investigator Sandy Badillo, a Fairfax County police officer, about the incident. Badillo, in turn, told Daugherty and Toney, who were assigned to an anti-shoplifting detail in the mall, that she suspected that Coates had attempted to create a diversion so Benefield could shoplift. Daugherty and Toney accordingly followed and watched Coates and Benefield while they shopped in the mall.

After leaving Georgetown Leather, Benefield entered a store called Ups N' Downs while Coates waited outside in the mall for her. Benefield looked at some sweaters that were on shelves at the front of the store. According to Benefield and Coates, Benefield held one of the sweaters up against her. She then indicated to Coates that the sweater would not do, and she folded it up and placed it back on the shelf. She then left the store and she and Benefield continued shopping.

Daugherty and Toney say they saw things differently. According to their testimony, they stood inside a store directly across from Ups N' Downs where they had a clear view of Coates and Benefield. Daugherty and Toney say they saw Benefield appear to make eye contact with Coates, who nodded, and Benefield picked up a sweater and put it under the sweater she was wearing. The officers state that she pointed to it as she left the store. Although the officers state that they had a clear view of the activities, they could not say what color the sweater was except that it was "light-colored." J.A. 122. The officers chose not to arrest Benefield at that point, however, and continued watching her.

Daugherty and Toney state that Benefield then went into another store, Petite Sophisticates, although Benefield stated at trial that she had no memory of going into Petite Sophisticates. Daugherty but not Toney followed her to this store. Daugherty watched from outside the store, but because there were stacks of clothes there he could see Benefield only from her shoulders up for a period of time. The officers state that Benefield stayed in Petite Sophisticates for a short time and then she and Coates walked to J.C. Penney's. Daugherty and Toney watched Coates and Benefield using the store's surveillance cameras. Coates and Benefield made a few purchases.

Coates left the store first and got the car. When Coates pulled up, Benefield approached the car. At this time, Daugherty arrested Benefield and Toney ordered Coates out of the car and placed him under arrest. The officers handcuffed Coates and Benefield and Daugherty searched Benefield but found no sweater. The officers took Coates and Benefield to the mall security office where they handcuffed them to chairs. Daugherty checked their identification and found that there were no outstanding warrants for either of them. Toney went with Officer Carlton to the only two places they say that Benefield could have dropped the sweater, Petite Sophisticates and J.C. Penney's. They found nothing at J.C. Penney's. Toney testified that a clerk at Petite Sophisticates told him that she had found a light-colored sweater on the floor and replaced it on the shelf. Toney did not attempt to identify this sweater by comparing brand names sold at Ups N' Downs and Petite Sophisticates, and admitted that, "There was no sweater. We didn't find the actual sweater...." J.A. 122–23.

Daugherty and Toney gave Benefield a summons for shoplifting and Coates a summons for aiding and abetting shoplifting. According to Coates and Benefield, when they returned to their car after the arrest there was a belt in the car that neither had seen before. The car had been in the exclusive possession of the police since the arrest. Coates testified that he and Bene-

field were worried that the belt had been placed in the car by the police either to scare them or to provide a pretext to arrest them again. After consulting a friend who was a police officer, Coates gave the belt to Captain Jackson at the Fairfax County Police Department. According to Benefield, her Christmas was ruined by the events: "all I did was cry. I was depressed. I lost about 20 pounds. I just couldn't function. I had never been through anything like that before.... I missed about 15 days" from work. J.A. 40–41.

Coates and Benefield engaged legal representation and were forced to attend court twice before the charges against them were dropped. The representation cost them about $1,500 in legal fees.

## II.

Daugherty and Toney raise two claims of error, namely, that the district court erred in not entering JNOV because they had probable cause to arrest Coates and Benefield, and that the court erred in not entering JNOV on the issue of qualified immunity. The only issue we need consider is the latter, because even if Coates and Benefield were arrested without probable cause, Daugherty and Toney could still be entitled to qualified immunity if a reasonable police officer could have thought there was probable cause, and Coates' and Benefield's suit would be barred. *See Torchinsky v. Siwinski*, 942 F.2d 257, 260 (4th Cir.1991). Daugherty and Toney raised the qualified immunity defense in the instant action only in their pleadings but not by way of a motion for summary judgment. Counsel for Daugherty and Toney candidly admitted at oral argument before us that he failed to raise the qualified immunity question at summary judgment because he felt that he would have had no chance to win such a motion.

 As Daugherty and Toney apparently requested, the magistrate judge instructed the jury on the qualified immunity question. Neither party challenges the propriety of submitting this question to the jury nor the contents of the instruction; thus we do not consider these questions

here. By entering a verdict against the officers, the jury implicitly found that the qualified immunity defense did not apply. The question we must therefore answer, in deciding this motion for judgment notwithstanding the verdict, is whether there is evidence upon which the jury could properly have based its verdict. As we have stated in this context:

> [O]ur power of review continues to be limited by the Seventh Amendment, which provides that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." ... We may not, therefore, weigh the evidence, pass on the credibility of witnesses, or substitute our judgment on the facts for that of the jury.

*Lust v. Clark Equipment Co.*, 792 F.2d 436, 437 (4th Cir.1986) (quoting *Tights, Inc. v. Acme–McCrary Corp.*, 541 F.2d 1047, 1055–56 (4th Cir.1976)). We will set aside factfinding by a jury only where the evidence, viewed in the light most favorable to the parties supporting the jury's verdict, is so clear that reasonable persons could reach no other conclusion than that asserted on appeal. *McElveen v. County of Prince William*, 725 F.2d 954, 958 (4th Cir.), *cert. denied*, 469 U.S. 819, 105 S.Ct. 88, 83 L.Ed.2d 35 (1984). A mere scintilla of evidence is insufficient to sustain the verdict, and the inferences a jury draws to establish causation must be reasonably probable. *Lust*, 792 F.2d at 437.

 The defense of qualified immunity generally protects "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The qualified immunity test for a warrantless arrest by a police officer such as occurred in this case is "whether a police officer acting under the circumstances at issue reasonably could have believed that he had probable cause to arrest, i.e., to believe that the arrestee was com-

mitting or had committed a criminal offense." *Sevigny v. Dicksey*, 846 F.2d 953, 956 (4th Cir.1988) (citing *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). *See generally Gooden v. Howard County*, 954 F.2d 960 (4th Cir.1992) (en banc). We must apply this test in an objective, albeit fact-specific, fashion; the officers' subjective beliefs about the search are irrelevant. *See Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039.

▮ While we do not find this case free from doubt, we are persuaded that there were facts upon which the jury could properly have found that qualified immunity should not apply. First, the jury could have determined that Daugherty and Toney did not have a sufficiently good view of Benefield's actions for a reasonable officer to be able to conclude that he had probable cause to arrest because the officers could not even say what color the sweater was. As Toney admitted, "Neither one of us could know what color the sweater was. We couldn't see the actual color of the sweater that was taken." J.A. 121–22.

Second, the jury could legitimately have decided that a reasonable officer would necessarily have lacked probable cause based on his observations of Benefield in Ups N' Downs because Daugherty and Toney failed to arrest and search her as soon as she left the store. While there is nothing inherently wrong as a procedural matter for the police to wait and follow suspects after they have probable cause that the suspects have stolen something, the jury might still infer, in a particular case, that such a decision evidences the *lack* of a reasonable basis for probable cause at the time the decision to wait was made.

Third, the jury could consider the fact that Toney and Daugherty could not find the allegedly stolen sweater, even though they said that they had Benefield clearly in view after she left Ups N' Downs, as evidence that the officers could not reasonably have seen what they said they saw. Toney could not find the sweater in the J.C. Penney's dressing room nor in the only other place Benefield went where the officers could not see her every move, Petite Sophisticates. The jury could take the fact that Toney did not investigate the sweater found in Petite Sophisticates as evidence that he did not think it was the stolen sweater, and then reason backwards, in combination with the other facts of the case, that Toney never could reasonably have thought that the sweater was taken in the first place. *See Clipper v. Takoma Park*, 876 F.2d 17, 20 (4th Cir.1989) (failure to investigate leads, in addition to other evidence in case, sufficient to defeat JNOV). There was no obligation by the jury to accept the officers' word for what they said they reasonably perceived, and apparently the jury did not.[1]

Finally, for JNOV purposes we must assume that Coates and Benefield were being truthful when they stated that they found a belt in their car after the police had exclusive possession of it. The jury could have inferred that the police planted the belt in the car and therefore, for some reason, the police had a vendetta against Coates and Benefield and were predisposed unreasonably to accuse them of shoplifting.[2] We are not suggesting that this necessarily was the case, nor that it would have provided sufficient grounds to deny JNOV on its own. However, in combina-

---

**1.** Coates did state at trial that:

 I've thought about this thing and thought about it and from where she was standing, if the officer was supposed to have been there and could have been watching, the angle that she was at and the way this thing was shifted, if he had been down in the other corner, it would appear to him that when she tucked that sweater back in she could have taken it. J.A. 56. However, although the jury was obligated to consider this statement, it was not obligated to conclude that this speculation was in fact what the officers did reasonably per-

ceive. The fact that the jury did not adopt this speculation as what happened in disposing of the case is no reason necessarily for us to grant JNOV.

**2.** Coates testified that Toney told him "ya'll can do this in D.C. or Maryland, but you can't do it in Virginia." J.A. 60. In addition, Coates said that, "He told me I probably paid for [the presents] with bad checks." J.A. 60. 6350 35 10 Toney did not deny making these statements. J.A. 119.

tion with the other facts of the case, we conclude that the jury's verdict was adequately supported and therefore must stand.

AFFIRMED.