44 F.3d 218
 65 Empl. Prac. Dec. P 43,372, 66 Empl. Prac.
Dec. P 43,530
Peggy M. SPICER, Plaintiff-Appellee,
v.
COMMONWEALTH OF VIRGINIA, DEPARTMENT OF CORRECTIONS,
Defendant-Appellant,
and
Buckingham Correctional Center; David Smith, in his
capacity as the Warden of Buckingham Correctional Center,
Commonwealth of Virginia Department of Corrections; J.M.
Perutelli, Captain, Defendants.
Peggy M. SPICER, Plaintiff-Appellant,
v.
COMMONWEALTH OF VIRGINIA, DEPARTMENT OF CORRECTIONS;
Buckingham Correctional Center; David Smith, in his
capacity as the Warden of Buckingham Correctional Center,
Commonwealth of Virginia Department of Corrections; J.M.
Perutelli, Captain, Defendants-Appellees.
 Nos. 93-2136, 93-2182.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 1, 1994.
Decided Jan. 18, 1995.
Rehearing En Banc Granted; Opinion Vacated March 1, 1995.
 
 ARGUED: Guy Winston Horsley, Jr., Sr. Asst. Atty. Gen., Office of the Attorney General, Richmond, VA, for appellant. Tinya Lynette Banks, Leftwich & Douglas, Washington, DC, for appellee. ON BRIEF: James S. Gilmore, III, Atty. Gen. of Virginia, Office of the Attorney General, Richmond, VA, for appellant. Natalie O. Ludaway, Brian K. Pearlstein, Leftwich & Douglas, Washington, DC, for appellee.
 Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.
 Affirmed in part and remanded in part by published opinion. Judge MOTZ, wrote the opinion, in which Judge MURNAGHAN joined. Judge NIEMEYER wrote an opinion concurring in part and dissenting in part.
 OPINION
 MOTZ, Circuit Judge:
 
 
 1
 This case involves cross appeals by a prison employee and her employer. The employer appeals the district court's grant of injunctive relief to the employee on her Title VII hostile environment sex discrimination claim and the award to her of attorney's fees. The employee appeals the court's denial of her motion for judgment notwithstanding a jury verdict against her on her retaliatory discharge claim.
 
 I.
 
 2
 Peggy M. Spicer is, and has been continuously since 1989, a rehabilitation counselor at Buckingham Correctional Center, an all-male prison operated by the Commonwealth of Virginia, Department of Corrections, which is located in Dillwyn, Virginia. On August 1, 1991, J.M. Perutelli, then a captain (but by the time of trial a major) in the prison security force, sent a memorandum to David Smith, the warden at Buckingham, that made reference to Spicer. The memorandum stated, in pertinent part,
 
 
 3
 Numerous security staff have received complaints from inmates complaining that female staff are allowed to enter the institution in clothing that their visitors would not be allowed to wear. Some specific examples include Ms. McCoy wearing culottes; Ms. Spicer wearing short dresses with a split in the back and blouses that are so revealing that you can see her breast nipples outlined in plain view; Ms. Gillespie wearing see thru clothing; Ms. Johnson (intern) wearing low cut blouses; Ms. Loukx wearing see thru pants; Ms. Dixon wearing culottes/mini skirt and Ms. Boggs wearing a sleeveless shirt.
 
 
 4
 (emphasis added).
 
 
 5
 On the same day that he received the memorandum from Perutelli, Warden Smith attached a short cover letter to it and sent it to B.W. Soles, the Assistant Warden, and Lynn Dixon, the supervisor of the nursing staff. Neither the cover letter nor the memorandum was marked "confidential." Moreover, Soles and Dixon were not instructed that the documents were confidential. Warden Smith admitted that the memorandum "should have been stamped" confidential[1] but instead, "made the assumption that they [Soles and Dixon] would figure it out." Unfortunately, neither Dixon nor Soles "figured it out." Both informed their staffs (Dixon's staff included three shifts of nurses, doctors, dentists, "everyone in the whole medical department") of the contents of the memorandum.
 
 
 6
 Spicer and six other female, non-security employees were summoned to Soles' office. Assistant Warden Soles read the memorandum aloud to them. When Spicer was read the memorandum she understood it only to accuse the group generally of wearing short skirts, and laughed it off, pointing out that with her knees she would not wear short skirts. She became aware of the memorandum's assertions as to her breasts when she "became the topic of discussion, of jokes, of comments being made." Spicer was told by another employee that the memorandum "was up in security on a clipboard, it was posted." Spicer looked for the memorandum but could not find it.
 
 
 7
 In the week following dissemination of the memorandum, Dr. Picarelli, a prison psychologist, while looking "directly at" Spicer said, "This is nipple check day." On another occasion, when "officers were like lined up on each side of [a prison] hall waiting for roll call," Spicer had to go through the hall to reach the security area. As she "was going through between the two lines there, one of the officers said, 'Which one is bigger, the one on the left or the one on the right?' " On still another occasion, Spicer was asked, in reference to her breasts, "Where are you going to put them?" In addition to becoming "the topic of discussion, of jokes, of comments," Spicer described the effect of the memorandum in these terms: "People staring at you, making you feel as if there is something wrong with you, making you feel undressed ... and people that I used to have conversation with you no longer have conversation with.... I didn't know when people were talking to me whether they were talking to me or looking at my chest to see what they could see. I just felt exposed."
 
 
 8
 After being the object of these remarks and learning that the memorandum had been read aloud to large numbers of the staff, Spicer was "angry" and "on the verge of crying," telling her supervisor, Barbara Wheeler, "I don't dress like that and I don't like this damn memo." On August 6, Spicer attempted to meet with the warden, but he was unavailable. When Spicer was unable to see the warden, she telephoned and then went to Richmond to see Robert Sizer, the manager of the equal employment opportunity office for the Department of Corrections. Spicer told EEO manager Sizer about the memorandum and her belief that it "was circulating" and possibly even on a bulletin board at Buckingham. Sizer and his supervisor telephoned Warden Smith and suggested that Smith "have someone go out through the institution to ascertain whether or not it had been posted" or circulated. The warden did this and determined that, along with the several copies found in various prison files, one copy of the memorandum was found on Captain Perutelli's clipboard "in the Watch office, to which he only should have access" and another copy was found on the "12-8 Watch Commander's clipboard," a location not specified as public or private in the record.
 
 
 9
 It was also suggested that Warden Smith "as soon as possible ... talk to each of the people mentioned in the letter and discuss it and see how they felt about it and if they had a problem with it." Smith, "talked to a majority of them." His meeting with Spicer only lasted two minutes because she assertedly "didn't have anything to say," "would only listen," and "looked angry." In his discussion with another female employee, the warden learned that two other unwanted sexual remarks resulted from the memorandum: Ms. Gillespie, another woman mentioned in the memorandum, was "asked for a date" by one security officer, G. Johnston, and asked by another officer, Lieutenant Eldridge, "how much money it would take to get into her pants."
 
 
 10
 On August 6, 1991, Warden Smith circulated a second memorandum that referenced the August 1 memorandum and stated, in pertinent part, "These examples were meant only to illustrate areas which might need to be examined, and were not meant as examples of wrongdoing." The August 6 memorandum did not apologize for, or retract, any portion of the earlier memorandum. Nor did Warden Smith, in his meeting with Spicer, or at any other time, apologize to her for the dissemination of the August 1 memorandum.
 
 
 11
 On August 9, EEO manager Sizer went to the prison "to ascertain[ ] if the memo [was] placed on the bulletin board or circulated." While there, Sizer met with "basically department heads" and "talked about the legalistic--this is a legalistic society these days. I talked to them somewhat about sexual harassment, things that could cause sexual harassment, et cetera, et cetera." Sizer "believed" that the meeting lasted "maybe an hour, hour-and-a-half. I'm not sure." "Minutes"[2] of the meeting indicated that it was a "mandatory" meeting attended by the warden and twenty other prison employees, including Perutelli, Soles, and Dixon, which the warden opened by stating that it "would not take long."
 
 
 12
 As to Sizer's original purpose for visiting the prison, he learned "that the memorandum was on the captain's clipboard ... that other copies were filed ... [but] could not ascertain if it [had been] circulated or not." EEO manager Sizer also "believe[d]" that he had learned that the memorandum had been read by Dixon and Soles to their respective staffs, but did not "recall" how many people Dixon read it to, and had "no idea" how many people Soles read it to. Nor did Sizer determine how many security officers were made aware of the memorandum.
 
 
 13
 Warden Smith was counseled by Larry Huffman, Regional Administrator for the Department of Corrections, and Edward Morris, Deputy Director for the Department, who "were just concerned about the way it was handled and felt like it could have been done a little different. They were concerned about the fact that ... [the] memo may have been a little too graphic, should have been a little more subdued." Sizer reported that he also "met with Mr. Smith and counseled with him the importance of appropriate communication with all staff in order to enhance a violation-free workplace."
 
 
 14
 Warden Smith, in turn, was responsible for counseling others who had acted in a discriminatory manner. Smith counseled Captain Perutelli, telling him the memorandum might have been "a little bit too graphic." The warden testified that the "counseling session lasted between five and ten minutes;" and that he only conducted it, "because [he was] told to do so." Further, the warden spoke to nursing director Dixon, individually, concerning the memorandum and reported that she "realized the concern." Smith also talked to Dr. Picarelli for five to ten minutes and, in the warden's words, "explained to him the seriousness of that and not to make comments of that nature and that it was inappropriate, all it did was fuel the fire. And being a pretty good psychologist, in my opinion, I think he understood real well."[3]
 
 
 15
 On September 19, EEO manager Sizer conducted a two hour "pretty standard-type training" session, in which a forty minute film was shown. The purpose of the session was "[t]o enlighten the people concerning sexual harassment, what constitutes sexual harassment, et cetera." Sizer thought "probably around 30, somewhere in that nature" people attended the session. He "believe[d]" that the session was mandatory for "certain individuals," but he did make up a list of those required to attend the session, and he was "not sure" if anyone had compiled such a list. There were no minutes of the session.
 
 
 16
 After her discussion with the Department of Corrections' EEO manager Sizer, Spicer filed a complaint with state and federal EEO offices but made no further complaints to prison officials. In the autumn of 1991, Spicer received a letter from the Commonwealth and from Sizer; each letter acknowledged the truth of her charges and outlined the training and counseling efforts, detailed above, to prevent "future incidents of this nature." No other offensive comments were made to Spicer, but she was treated differently at the prison:
 
 
 17
 ... people that I normally would talk to, they didn't talk to me anymore. I was stared at. You felt like you are being undressed, you were ignored. Just very uncomfortable. Everything just changed.
 
 
 18
 The remarks caused Spicer to alter her work routine. She spent increased time in her office and layered her clothing. In addition, Spicer's emotional well-being suffered; she entered counseling and was still in counseling at the time of her trial.
 
 
 19
 On December 2, 1991, a communication from the federal EEOC as to Spicer's complaint was received at the Buckingham prison. On December 5, 1991, Warden Smith removed Spicer from Buckingham's Work Committee, on which she had served during the entire time she had worked at Buckingham. The Work Committee assigns jobs within the prison to inmates. Warden Smith explained, "The staff supervises the inmates and the inmates do all the work, such as cooking, cleaning, painting." Spicer testified she "took pride in" her work on the Work Committee and "felt good about it" and she believed it had been taken "away from her" simply because the warden had received her federal EEOC complaint. She grieved her removal from the Work Committee, asserting that it was done in retaliation for filing the EEOC complaint and that this removal, too, "fostered a hostile work environment." The warden asserted that prior to removing Spicer from the Work Committee, he had disagreed with her about how the Committee should function, had received some complaints from inmates and staff concerning her performance on the Work Committee, and she had chaired some Work Committee meetings when she was not authorized to do so. The Commonwealth's Director of the Department of Employee Relations Counselors concluded, over the warden's objection, that the matter was grievable, and Spicer was reinstated on the Work Committee.
 
 
 20
 On September 23, 1992, after receiving a right to sue letter, Spicer filed this action in the United States District Court for the Eastern District of Virginia, alleging that the Department of Corrections, Warden Smith, and Captain Perutelli had discriminated against her in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000e et seq., creating a hostile environment, and when she complained of this, Warden Smith retaliated against her by removing her from the Work Committee. The case was tried in May, 1993; at trial, a number of facts were disputed. Spicer testified that she had never been advised of any dress code policy for non-security staff during her employment at Buckingham or in previous employment in state prisons; and that she had received no complaints about her attire before this memorandum. She also categorically denied ever wearing the clothing complained of in the memorandum.[4] Although there was a written dress code policy for visitors, the prison supervisors conceded that there was no written dress code policy for staff. Most supervisors believed that, nevertheless, even non-security staff should comply with the visitors' dress code.[5] Although Captain Perutelli and his subordinate, Lieutenant Yates, asserted that Spicer was inappropriately dressed and therefore that the memorandum was true, no other prison supervisor had ever seen Spicer dressed in an "inappropriate," let alone "provocative" manner.
 
 
 21
 Perhaps, the most significant factual dispute was as to whether the institution had taken effective remedial measures. On the one hand, there was the evidence of the counseling and training outlined above. On the other, no "disciplinary action," except for counseling, was taken against any employee for his or her role in the incident, no employee's duties were reduced or curtailed because of the incident, no record of the incident was even placed in the personnel folder of any employee, and Perutelli was, in fact, promoted and given a salary increase after the incident. Moreover, notwithstanding the postincident training and counseling they received, both Perutelli and Warden Smith testified at trial that they did not believe the memorandum was inappropriate. Perutelli stated, "I feel that it is not too explicit because it is the truth." The warden agreed that the memorandum was "not written too graphically" and was not "inappropriate."
 
 
 22
 After hearing all the evidence, the district court granted judgment in Spicer's favor on her Title VII hostile environment claim. The district court specifically found that "plaintiff has established that she was subjected to unwelcome sexually-based harassment as a result of the issuance of the memorandum and ensuing events, that such harassment was sufficiently pervasive and severe to create an abusive working environment, and that her employer, having knowledge of the problem, failed to take prompt and adequate remedial action." The court further found, "[t]his harassment would have interfered with the work performance or significantly affected the psychological wellbeing of a reasonable person in the plaintiff's position." The court properly awarded no damages on the Title VII sexual harassment claim, arising from conduct occurring prior to enactment of the Civil Rights Act of 1991. Nor did it attempt to take over the prison via large-scale injunctive relief. Instead, the district court fashioned a limited injunction to address the specific deficiencies uncovered at trial. It ordered the Department to provide effective training on employment discrimination, to "take positive steps" to guard against sexual harassment, and to report those steps to the court within 180 days. Spicer's retaliation claim, i.e., that she was removed from the Work Committee because she had complained of a hostile work environment, was based on conduct occurring after enactment of the Civil Rights Act of 1991 and so submitted to a jury. In a special verdict, the jury found that Spicer had been retaliated against, but that she would have been removed from the Work Committee in any event, and so issued a verdict for the Department. The court awarded Spicer attorney fees in the amount of $29,796.93.
 
 II.
 
 23
 We first address the Commonwealth's claim that the district court erred in deciding in favor of Spicer on her hostile environment claim. A district court's determination that sexual harassment created a hostile environment is a question of fact. "Whether ... 'harassment was sufficiently severe or pervasive is quintessentially a question of fact.' " Beardsley v. Webb, 30 F.3d 524, 530 (4th Cir.1994) (citing Paroline v. Unisys Corp., 879 F.2d 100, 105 (4th Cir.1989), vacated in part on other grounds, 900 F.2d 27 (4th Cir.1990) (en banc)). "In Title VII actions, a district court's factual determinations are governed by Rule 52(a)'s clearly erroneous standard even if they resolve the ultimate issue of the action--such as, whether there was discrimination, sexual harassment, or discriminatory intent." Dwyer v. Smith, 867 F.2d 184, 187 (4th Cir.1989). In addition, "The adequacy of ... [a] remedy is a question of fact ..." Paroline, 879 F.2d at 106.[6]
 
 
 24
 Of course, the clearly erroneous standard does not prohibit us from conducting a meaningful review of a district court's decision. See People Helpers Foundation v. Richmond, Va., 12 F.3d 1321, 1329 (4th Cir.1993); Wileman v. Frank, 979 F.2d 30, 38 (4th Cir.1992). We may not, however, "improperly conduct[ ] ... a de novo weighing of the evidence in the record." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 576, 105 S.Ct. 1504, 1513, 84 L.Ed.2d 518 (1985) (reversing this court because of that error).
 
 
 25
 Under the clearly erroneous standard, a district court's decision must be affirmed even if a "majority of this court might be inclined to draw a contrary inference, [when] we cannot say that the inferences drawn by the district court ... were not supported by substantial evidence." Glasscock v. United States, 323 F.2d 589, 591 (4th Cir.1963), aff'g 207 F.Supp. 318 (E.D. Va.1962). See also Anderson, 470 U.S. at 577, 105 S.Ct. at 1513; Beck v. QuikTrip Corp., 708 F.2d 532, 535 & 536 n. 1 (10th Cir.1983) (recognizing that factual findings may be adequate even if they are not exhaustive when the facts in the record support those factual findings); Maxwell v. Mason, 668 F.2d 361, 362 (8th Cir.1981) (same).
 
 
 26
 In order to determine whether the facts in the record support the district court's factual finding that the sexual harassment endured by Spicer created a hostile work environment, it is necessary to consider the elements of such a claim. Establishing a Title VII hostile environment claim is a two step process.
 
 
 27
 First, the plaintiff must make a prima facie showing that sexually harassing action took place, and if this is done, the employer may rebut the showing either directly, by proving the events did not take place, or indirectly, by showing that they were isolated or generally trivial. Second, the plaintiff must show that the employer knew or should have known of the harassment, and took no effectual action to correct the situation. This showing can also be rebutted by the employer directly, or by pointing to prompt remedial action reasonably calculated to end the harassment.
 
 
 28
 Dwyer, 867 F.2d at 187 (citing Katz v. Dole, 709 F.2d 251, 256 (4th Cir.1983)).
 
 A.
 
 29
 As to the first step, in the present case, the Commonwealth does not deny that the complained of events occurred. Instead, it contends, "All of the cases which have determined conduct to be sexual harassment have involved much more serious harm than is present in this case."
 
 
 30
 This may be so, but as the Supreme Court recently noted in Harris v. Forklift Systems, Inc., --- U.S. ----, ----, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993):
 
 
 31
 The appalling conduct alleged in Meritor, and the reference in that case to environments, " 'so heavily polluted with discrimination so as to destroy completely the emotional and psychological stability of minority group workers,' " merely present some especially egregious examples of harassment. They do not mark the boundary of what is actionable.
 
 
 32
 (citations omitted). Thus, the standard for determining that sexual harassment constitutes a hostile work environment, "is not, and by its nature cannot be, a mathematically precise test," and so the boundary of what is actionable is unclear. Id. Moreover, no prior decisions of this court hold that the facts of this case fall outside the boundary of actionable cases. See, e.g., Paroline, 879 F.2d at 105; Dwyer, 867 F.2d at 188; Swentek v. USAIR, Inc., 830 F.2d 552 (4th Cir.1987); Katz, 709 F.2d at 256.
 
 
 33
 There is record support for the district court's finding that Spicer established that she was "subjected to unwelcome sexually based harassment as a result of the issuance of the memorandum and ensuing events, [and] that such harassment was sufficiently pervasive and severe to create an abusive working environment." Furthermore, there was evidence that Spicer's reaction to the harassment was objectively reasonable and it is clear that she was subjectively harmed by the harassment. Therefore, Spicer met the requirements necessary to satisfy the first step of a hostile environment claim.
 
 B.
 
 34
 We now turn to the closer question of whether the remaining step was established, i.e., that the employer knew of the harassment and did not take effective action to correct it. As to this point, the Commonwealth admits that it had notice of the harassment, but asserts that "evidence shows that Defendant's response to the complaint was prompt and effective." (emphasis in original).
 
 
 35
 The Commonwealth contends that because Spicer did not make further complaints of sexually offensive comments after August 9, the training and counseling sessions outlined above were necessarily adequate remedial measures. The absence of additional complaints is a factor that a court should consider when evaluating the adequacy of a remedial response, but a remedial response is not sufficient solely because plaintiff does not complain after remedial steps are taken. See Paroline, 879 F.2d at 107 (holding "a fact finder could reasonably conclude" employer's remedial action "was inadequate under the circumstances," despite the fact that plaintiff had not made any additional complaints of harassment).
 
 
 36
 To avoid liability, an employer's remedial action must be both "prompt and adequate. " Id. at 106 (emphasis in original). The district court found the Department's was neither. In fact, there was certainly evidence that some remedial action was promptly taken, i.e., a meeting, a training session, and individual counseling. Indeed, Spicer does not even assert that the remedial measures were not prompt. Thus, the only question on this point is, was the district court clearly erroneous in concluding that the remedial action was not adequate?
 
 
 37
 It seems to us that there was sufficient evidence that the Department's remedial response was inadequate that we cannot conclude that the district court was clearly erroneous in so finding. First, the August 1 memorandum was never officially, or unofficially, retracted. The August 6 memorandum, at best, modified the August 1 memorandum. It did not, however, admit that the August 1 memorandum, the public dissemination of it, or events of harassment arising from the memorandum, were improper. Nor did Warden Smith, Captain Perutelli, or any other prison supervisor apologize to Spicer for the dissemination of the August 1 memorandum. In addition, other than counseling, no disciplinary action was taken against any prison employee, not even notation of the incident in an employee's personnel file.
 
 
 38
 Moreover, there is evidence that the counseling that was undertaken, although prompt, was neither adequate nor effective. Perutelli, the author of the August 1 memorandum, was only begrudgingly counseled for five to ten minutes. The ineffectiveness of this counseling is evidenced by his post-counseling trial testimony that the memorandum "is not too explicit because it is the truth." Similarly, the counseling Warden Smith received apparently merely consisted of the communication of a "concern" by his supervisors that the memorandum "may have been a little too graphic." Again, the ineffectiveness of this counseling is evidenced by the warden's trial testimony, that, in his view, the memorandum was "not written too graphically" and not "inappropriate."
 
 
 39
 Furthermore, the trial testimony of Sizer, the EEO manager who was responsible for overseeing the Department's remedial action, did not inspire confidence in the effectiveness of the remedial action. Sizer conceded that he had "not conducted any training on sexual harassment in quite awhile." Perhaps that explains why Sizer "thought" his training session was mandatory, but did not require anyone to attend, did not know who attended, did not remember much of what was taught or the age or content of the film shown, and resisted the notion that jokes of a sexual nature could create a hostile work environment.[7] The district court, justifiably, became impatient with Sizer. After hearing his testimony and observing his demeanor, the district court specifically found that Sizer was "insensitive." Clearly, the effectiveness of the Commonwealth's remedial program is undercut by the fact that the person responsible for investigating the occurrence of, and training about sexual harassment, was himself "insensitive;" and the fact that neither the author nor the disseminator of the memorandum in question believed, even after training and counseling, that the memorandum was "too graphic" or "inappropriate."
 
 
 40
 Finally, even if the trial testimony of Warden Smith and Captain Perutelli is disregarded, and even if it is assumed that, although Sizer was "insensitive," his meeting and training session were effective for those who attended,[8] there is scant evidence that all persons guilty of sexual harassment actually attended them. The "minutes" of the August 9 meeting reflect that Smith, Perutelli, Dixon, and Soles[9] attended, but among those not listed as attending are Dr. Picarelli, who made the "nipple check" remark to Spicer and Officers Johnston, and Eldridge, both of whom made remarks to another woman referred to in the memorandum. Furthermore, the Commonwealth offered no evidence as to the identity of any of the attendees of the September 19 training session other than EEOC manager Sizer's statement in his letter to Spicer that the session was "for Supervisors, Department Heads and any others that wished to attend."
 
 
 41
 The district court, who was able to view the demeanor of all of the witnesses, found that the Department of Corrections had not taken serious or effective action to stop sexual harassment.[10] The evidence outlined above makes it impossible for us to conclude that this finding was clearly erroneous. We note that the Commonwealth has not cited, and we have not found, any case in which, this, or any other court of appeals, has reversed a district court's factual finding in favor of a plaintiff on a hostile work environment claim. This does not mean that it is never appropriate to reverse a district court that finds in favor of a plaintiff on a hostile environment claim, but it does indicate that this is a very unusual step. We believe that this case falls into that large group of cases in which, as a matter of law, the plaintiff neither clearly establishes a hostile environment claim nor clearly fails to establish such a claim. Thus, the question must be determined by a fact finder.
 
 
 42
 The dissent painstakingly demonstrates that a fact finder could have held differently on these facts. We do not deny this. We do not hold that Spicer was entitled to judgment as a matter of law on her hostile environment claim. All that we hold is that the totality of the evidence here makes it impossible to conclude that the district court was clearly erroneous in granting judgment for her on that claim. That evidence included not only the evidence discussed by the dissent--the failure to retract the August 1 memorandum, or to apologize to Spicer, or to mete out any disciplinary action, other than counseling[11] (indeed Perutelli was promoted)--but also a good deal of crucial evidence not mentioned by the dissent. Months after the circulation of the memorandum, the offensive remarks and allegedly effective remedial measures, the warden and Captain Perutelli testified at trial that they did not view the memorandum as "too graphic," "too explicit," or "inappropriate." The fact finder was entitled to conclude from this evidence, particularly in view of the unimpressive trial testimony of the EEO manager responsible for overseeing the remedial action and the Department's total failure to demonstrate that the "guilty parties" attended the training sessions, that the Department's remedial measures were inadequate.[12] In sum, our holding here is dictated by Rule 52; it is hardly a "dramatic change in the law." Rather, a contrary holding--that in the face of this evidence the fact finder was clearly erroneous in concluding the Department's remedial measures were inadequate--would indeed be such a "dramatic change in the law," one that no court has undertaken. See Anderson v. City of Bessemer City, 470 U.S. at 576, 105 S.Ct. at 1513.
 
 III.
 
 43
 Spicer's retaliatory discharge claim was heard by a jury that returned a special verdict, which contained two questions. The first asked, "Do you find from a preponderance of the evidence in this case that the filing of a civil rights complaint by plaintiff was a motivating factor in the Defendant's decision to remove her from the Work Committee in December of 1991?" The jury answered that question in the affirmative. The second question asked, "Do you find from a preponderance of the evidence in this case that plaintiff would not have been removed from the Work Committee in the absence of a retaliatory motive?" The jury answered that question in the negative. In sum, the jury found that Spicer would have been removed from the Work Committee in the absence of a retaliatory motive. Therefore, Spicer did not prevail on her retaliatory discharge claim. See McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir.1991); Ross v. Communications Satellite Corp., 759 F.2d 355, 366 (4th Cir.1985). Spicer argues that we should overturn the jury's verdict that she would have been removed from the Work Committee had she not filed her discrimination claim.
 
 
 44
 "We will set aside factfinding by a jury only where the evidence, viewed in the light most favorable to the parties supporting the jury's verdict, is so clear that reasonable persons could reach no other conclusion than that asserted on appeal." Coates v. Daugherty, 973 F.2d 290, 293 (4th Cir.1992). Here, there was evidence, which the jury could have reasonably believed, that Smith would have removed Spicer for the Work Committee because of philosophical differences about the Committee, inmate and staff complaints, and because she improperly chaired Work Committee meetings when she was not authorized to do so. Accordingly, there is no basis for upsetting the jury verdict.
 
 IV.
 
 45
 Finally, the Department of Corrections appeals the district court's order granting attorney's fees, asserting that the district court awarded Spicer attorney's fees as a prevailing party on both her hostile environment and retaliatory discharge claims.
 
 
 46
 [T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought or comparable relief through a consent decree or settlement. Whatever relief the plaintiff secures must directly benefit him at the time of judgment or settlement.
 
 
 47
 Preston v. Commonwealth of Virginia, 31 F.3d 203, 208 (4th Cir.1994) (citing Farrar v. Hobby, --- U.S. ----, ----, 113 S.Ct. 566, 573 [121 L.Ed.2d 494] (1992)). Spicer's counsel conceded at oral argument that attorney's fees should not be awarded on the retaliation claim if, as we have held, the jury verdict against her on that claim is sustained.[13]
 
 
 48
 Thus, the only question before us as to the attorney's fees, is whether the district court awarded Spicer attorney's fees on the retaliatory discharge claim. Although, it is not entirely clear that the court did this, we believe that there is enough evidence in the record that it did that a remand is necessary. Immediately after the jury announced its verdict and was dismissed, the trial court noted, "We have got a finding for the plaintiff on both issues." (emphasis added). Similarly, the court concluded its memorandum opinion granting judgment for Spicer on her hostile environment claim, with the following statement:
 
 
 49
 As plaintiff's request for costs and attorney's fees relates to plaintiff's retaliation claim, as well as the hostile environment claim considered here ... the issues of costs and attorney's fees will be addressed in a separate Order.
 
 
 50
 Finally, in its memorandum opinion explaining its fee award, the district court again seemed to indicate that Spicer had prevailed not only on her hostile environment claim, but also on her retaliation claim:
 
 
 51
 In this case, plaintiff prevailed in a bench trial on her claim of sexual harassment and discrimination under Title VII. With respect to plaintiff's separate but related retaliation claim, a jury found that plaintiff's removal from the Institutional Work Committee at Buckingham Correctional Center was tainted by a retaliatory motive.
 
 
 52
 Although, the district court did not expressly state that it was awarding fees for success on the retaliation claims, it seems to us that the passages quoted above suggest that the district court believed Spicer had, indeed, prevailed on that claim and, so, was entitled to fees for that success. If this was done, it was error because Spicer was not the prevailing party on her retaliation claim. On remand the district court should only award appropriate fees incurred in connection with Spicer's hostile environment claim.[14]
 
 V.
 
 53
 For the reasons set forth above, the judgment in favor of Spicer on her hostile environment claim is affirmed, the order denying Spicer's motion for judgment notwithstanding the verdict is affirmed, and the order awarding Spicer attorney's fees is remanded to the district court for further proceedings consistent with this opinion.
 
 
 54
 AFFIRMED IN PART AND REMANDED IN PART.
 
 
 55
 NIEMEYER, Circuit Judge, concurring in part and dissenting in part:
 
 
 56
 Peggy Spicer, a rehabilitation counselor employed by the Virginia Department of Corrections at the Buckingham Correctional Center, filed a complaint, alleging sexual harassment in the form of remarks made to her by fellow employees and retaliation by her employer for filing a sexual harassment complaint with the EEOC. The jury found against Spicer on her retaliation claim, but the district court ruled in her favor on the sexual harassment claim. The court awarded attorneys fees incurred by Spicer apparently in connection with both aspects of her suit.
 
 
 57
 I concur in Part III of the majority opinion affirming the jury verdict. As to Part II, affirming the employer's liability on Spicer's sexual harassment claim, I would reverse on the ground that once the inappropriate remarks of co-employees were brought to the attention of the Virginia Department of Corrections, it acted immediately and effectively to eliminate this isolated yet offensive behavior. Under established precedents in this circuit, an employer is not absolutely liable for its employees' work place remarks. Rather, an employer can only be held liable if it possesses actual or constructive knowledge of harassment and fails to take any prompt and effective remedial action. See Swentek v. USAIR, Inc., 830 F.2d 552 (4th Cir.1987); Katz v. Dole, 709 F.2d 251 (4th Cir.1983). Because of my conclusion on Part II, I would also reverse the award of attorneys fees discussed in Part IV because Spicer would not be a prevailing party.
 
 
 58
 Buckingham Correctional Center, where Spicer was employed, is a maximum security prison housing approximately 1,000 male felons. A majority of the felons have been convicted for violent crimes and 37% for sexual offenses. For significant security reasons, especially the safety of its female employees, the institution maintains an informal dress policy prohibiting employees from dressing in any manner that might arouse the inmates. As Warden David Smith testified:
 
 
 59
 [B]ased on my experience, there is certain appropriate ways to dress and certain appropriate ways you don't dress around inmates. And I think it is just more a matter of common sense in that type of environment. I have seen staff held hostage; I have seen staff assaulted; I've seen a lot of things. I've seen attempted rapes on staff. And all of these things you bring with your experience to bear that there is a right and a wrong way to dress in that environment....
 
 
 60
 The policy parallels the formal dress code imposed on visitors to the prison.
 
 
 61
 In July 1991, an elderly woman visiting the prison to see her son, an inmate, complained irately to Lt. Antoinette Yates about the dress of Peggy Spicer, who was the counselor on duty that day. The visitor stated, "I can't believe that as tough as you are with the visitor's dress code that you would allow one of your employees to come into your institution dressed like this," referring to Spicer. Lt. Yates looked at Spicer and confirmed her inappropriate dress. As Lt. Yates testified:
 
 
 62
 She had on a pullover sweater. If you would excuse me--I'm very embarrassed--her nipples were plainly viewed like she didn't have a bra on.
 
 
 63
 The visitor threatened to complain to the warden. Yates reported the visitor's complaint to the captain of the security force, Capt. J.M. Perutelli. Capt. Perutelli, who had received complaints from other visitors about the dress of employees at the institution, wrote a memorandum to Warden Smith dated August 1, 1991, about the inappropriate dress of several employees. The portion of the memorandum discussing Spicer's dress stated:
 
 
 64
 Numerous security staff have received complaints from inmates complaining that female staff are allowed to enter the institution in clothing that their visitors would not be allowed to wear. Some specific examples include ... Miss Spicer wearing short dresses with a split in the back and blouses that are so revealing that you can see her breast nipples outlined in plain view.
 
 
 65
 Capt. Perutelli requested that Warden Smith "address" this matter. Warden Smith forwarded the August 1 memorandum to the supervisors of the employees involved, together with a cover letter directing the supervisors to "take appropriate action." Warden Smith admitted in retrospect, however, that he had erred in failing to label the memorandum "confidential." A few days later, on August 6, 1991, Warden Smith sent an additional memorandum to all department heads advising them that the employees must dress "in a professional manner." That memorandum pointed out that the employees deal with an "extremely difficult section of society," and "[w]e should all take this opportunity to examine our wardrobes and appearance to ensure that we dress professionally at all times."
 
 
 66
 Two of the managers to whom the August 1 memorandum was sent, Mr. B.W. Soles and Ms. L. Dixon, read the memorandum at their individual staff meetings. Beginning on August 6, 1991, in response to the memorandum, a few fellow employees subjected Spicer to various sexually offensive comments: "This is nipple check day," "Which one is bigger?" and "Where are you going to put them?" Both angry and upset by the teasing, Spicer promptly complained to her immediate supervisor, Barbara Wheeler, telling Wheeler that she wanted to talk to Warden David Smith. Wheeler called Smith to indicate that Spicer wanted to see him, without mentioning the reason for the requested visit. Warden Smith was in a meeting and Spicer was advised that she could meet with him the following morning. The next morning, August 7, Spicer instead called Bob Sizer, the equal employment officer for the Department of Corrections, to complain, and on August 8 she met with Sizer in Richmond. After meeting with Spicer on August 8, Sizer consulted with Ed Morris, the Deputy Director for Adult Institutions in Virginia, and Morris promptly called Warden Smith and had him investigate whether the August 1 memorandum had been posted on any bulletin boards or in any other public places. Warden Smith found that the memorandum had not been posted anywhere but on the clipboards of Capt. Perutelli and the "12-8 Watch Commander." Capt. Perutelli's clipboard was private, and there is no indication in the record that the 12-8 Watch Commander's clipboard was not likewise private. In response to Morris' call, Warden Smith also met individually with Spicer and most of the other women mentioned in the August 1 memorandum to discuss their concerns. Smith counseled those individuals who made the inappropriate sexual comments to Spicer and threatened disciplinary action if such conduct was repeated. Finally, Warden Smith spoke with Capt. Perutelli for five to ten minutes, expressing his concern that the memo had been too graphic.
 
 
 67
 The next morning, August 9, 1991, Sizer conducted an informal training session on sexual harassment which was attended by approximately 23 employees. The session lasted for one to one and one-half hours. Sizer led a second training session about a month later. This session was attended by about 30 employees, lasted about two hours, and included a 40-minute film titled "The Other Point of View." Finally, Sizer wrote Spicer a letter detailing the steps taken by the Department of Corrections to address her complaint. He concluded this letter with the following:
 
 
 68
 It is unfortunate that a situation of this nature developed, but, we can assure you that Administrative action was taken with appropriate individuals to help prevent future problems like this from occurring.
 
 
 69
 I hope that the work environment has improved and I will be glad [to] meet with you at anytime to discuss any further concerns that you might have.
 
 
 70
 Spicer acknowledged that after Sizer became involved in her complaint on August 7, no one made any sexually offensive remarks to her.
 
 
 71
 In short, on the very day that Spicer complained to her employer about the memorandum and the sexually offensive remarks, action was taken to assure that the memorandum was not publicly posted, to counsel those involved in writing and distributing the memorandum about treating such matters more sensitively, and to admonish those making inappropriate sexual remarks that such conduct will not be tolerated. In addition, two training sessions were conducted to educate employees and prevent the recurrence of such remarks. There is no evidence in the record to indicate that this incident was other than the brief, isolated result of an inartfully drafted memorandum about a legitimate and important concern. To hold the Virginia Department of Corrections liable under these circumstances is tantamount to imposing strict liability on an employer for all work place conversations that are inappropriate, regardless of the employer's response. This holding is a dramatic change in the law.
 
 
 72
 It is well established in this circuit that an employer will not be held liable for isolated remarks of employees unless the employer "knew or should have known of the harassment, and took no effectual action to correct the situation." See Katz v. Dole, 709 F.2d 251, 256 (4th Cir.1983) (emphasis added). We reiterated the same test in Swentek v. USAIR, Inc., 830 F.2d 552 (4th Cir.1987), holding that an employer is liable only "where it had 'actual or constructive knowledge of the existence of a sexually hostile working environment and took no prompt and adequate remedial action.' " Id. at 558 (quoting Katz ) (emphasis added). See also Paroline v. Unisys Corp., 879 F.2d 100, 106 (4th Cir.1989).
 
 
 73
 In Swentek, the plaintiff, a USAir flight attendant, alleged that another employee, a USAir pilot, made crude and sexist remarks to her, sang dirty limericks in front of her, exposed himself to her by dropping his pants, reached under her skirt, and grabbed her genitals during a chance meeting in the stairwell. After USAir received the complaint, the offending pilot was ordered into his superior's office where the pilot admitted to some "unprofessional language and conduct" but denied other actions of which he was accused. USAir's investigation produced conflicting stories. Nevertheless, it issued a written warning and threatened a suspension if further substantiated complaints were filed. In addition, USAir monitored the pilot's conduct for improvement and found that after the reprimand, no further complaints were lodged against him. The district court found that USAir fully met its responsibility under Title VII, and we affirmed.
 
 
 74
 We have never suggested an employer must make the most effective response possible. Rather, we have consistently held that an employer is only liable for the sexual harassment of its employees if no adequate remedial action is taken.
 
 
 75
 The record in this case does not support a conclusion that the Virginia Department of Corrections' response was inadequate, especially when Spicer conceded that no more offensive remarks were made after Sizer intervened. The evidence about the Department of Corrections' response to Spicer's complaints is undisputed. Its effectiveness in eliminating the problem is also undisputed. Yet the district court made no findings about the employer's response except to conclude summarily and without factual support, "Defendant, when informed of these incidents, failed to take effective remedial action." The district court never explained why the employer's response was not fully consistent with the well established standard in this circuit. If the district court's conclusion amounts to a finding of fact, then it is clearly erroneous.
 
 
 76
 The majority has attempted to fill this gap left by the district court by arguing that the Department of Corrections' response and training of employees was flawed and could have been more effective. Without any support in precedent, the majority details steps which it believes the Department of Corrections should have taken in this case and, by implication, imposes them as requirements for an "adequate response" to an employee's complaint of sexual harassment by co-employees. These "requirements" would mandate, inter alia, that the Department of Corrections retract the August 1 memorandum, apologize to Spicer, and impose disciplinary action, in addition to counseling, on offending employees. The majority also concludes that the counseling provided by the Department was neither adequate nor effective. None of these prescriptions, advanced gratuitously by the majority, are required under the law of this circuit.
 
 
 77
 Just as important, because the district court failed to make factual findings on any of these matters, in accordance with Federal Rule of Civil Procedure 52(a), the majority has simply engaged in its own interpretation of the record on appeal in an effort to rationalize or support the district court's unsupported conclusion that "Defendant, when informed of these incidents, failed to take effective remedial action." Even so, I submit that the majority's factual interpretation of the record is, at best, partial.
 
 
 78
 For instance, the majority states that the August 1 memorandum was never retracted and that no one at the Department of Corrections ever apologized. This conclusion fails to take into account several facts in the record. First, no one has established that the matters contained in the August 1 memorandum were inaccurate and needed retracting. The memorandum was directed at the important security purpose of enforcing a dress policy at an all-male maximum security prison that is far from a typical working environment. That the memorandum was too graphic and that the criticism could have been handled more delicately were flaws acknowledged by the employer and corrected. Indeed, at oral argument, Spicer's counsel admitted that there was no problem with the memorandum per se, but only with the way it was handled so publicly in the absence of a confidential label. Warden Smith issued a memorandum in which he sought to clarify that the contents of the August 1 memorandum were only intended "to illustrate areas which might need to be examined, and were not meant as examples of wrongdoing. I am very pleased with the performance of my staff and the jobs that you are doing." Moreover, Warden Smith followed up to assure that the August 1 memorandum was not publicly posted, and the Department of Corrections acknowledged the memorandum's deficiencies to Spicer, expressing regret. The Department of Corrections also sent a letter to Spicer advising her of all the corrective measures taken and stating, "It is unfortunate that a situation of this nature developed, but, we can assure you that Administrative action was taken with appropriate individuals to help prevent future problems like this from occurring." The letter to Spicer concluded with the conciliatory statement, "I hope that the work environment has improved and I will be glad [to] meet with you at anytime to discuss any further concerns that you might have." Recognizing that neither the majority nor I am the fact finder in this case, I nevertheless would readily conclude that these statements amounted to an apology. The Department's letter acknowledged the problem, expressed regret, and promised assurances for a better work environment.
 
 
 79
 In a further effort to support the district court's unsupported conclusion that the employer did not take immediate and effective action, the majority points to the fact that no one was disciplined other than by counseling. A factual finding of this type again implicitly assumes that a specific response is required from an employer. The personnel involved in drafting and distributing the August 1 memorandum thought they were enforcing an appropriate and important dress policy for the institution. Through unintended misjudgment, they wrote too graphically and publicized too widely. However, they were counseled about their errors and subjected to training sessions. I submit that the law requires no more. See Swentek, 830 F.2d at 558-59. Those responsible for the individual offensive remarks to Spicer were also counseled. In the absence of any evidence that any employee made more than a single offensive comment to Spicer, I cannot see how additional disciplinary actions are required for an "adequate" response. Cf. Swentek, 830 F.2d at 558 (a written warning was a sufficient response in a case involving repeated touching and grabbing and incessant sexually crude remarks by a particular employee). The purpose of requiring an employer to act immediately and effectively is to eliminate the hostile environment created by the inappropriate remarks. The Department of Corrections' response accomplished that purpose.
 
 
 80
 Finally, the majority concludes, again without any finding of fact by the district court, that the training sessions could be found to be inadequate. The majority states that there is "scant evidence that all persons guilty of sexual harassment actually attended [the sessions]." The majority then makes an effort, unsuccessfully, to determine whether the parties who made inappropriate remarks in fact attended either of the training sessions, which in the aggregate had over 50 persons in attendance. Indeed, the majority has absolutely no evidence that the guilty parties did not attend the training sessions.
 
 
 81
 The majority's efforts to fill gaps left by the district court are not only ill advised, but they amount, in my judgment, to blind deference to the district court's single conclusory statement made in lieu of factual findings. At bottom, the majority imposes an impossible, new standard on employers who have sexual harassment policies in place and personnel appointed to enforce the policies, and who undertake immediate action to halt inappropriate sexual remarks made in the work place. The new standard, approaching absolute employer liability, is a significant and impractical departure from our existing precedents.
 
 
 82
 For the foregoing reasons, I dissent in all but Part III of the majority opinion.
 
 
 
 [1]
 Warden Smith agreed, at trial, that he had stamped other prison memoranda "confidential" when he "deem[ed] something to be confidential or personal in nature" and, indeed, had stamped as "confidential" a report he later sent to the EEO coordinator about Spicer's complaint
 
 
 [2]
 Sizer did not prepare these "minutes." Indeed, neither Sizer nor any one else identified the author of the "minutes." Sizer testified that he did not issue a "directive" requiring attendance at the meeting and did not even "know the names of some" of the people listed in the "minutes" as attending the meeting but simply "assume[d]" they had attended "since this is the minutes of the meeting."
 
 
 [3]
 Warden Smith, at EEO manager Sizer's request, reported the investigation of the memorandum's dissemination, interviews with the women named in the memorandum, and the counseling of other employees, detailed above, in a memorandum to Sizer, dated August 13, 1991. See supra n. 1
 
 
 [4]
 Q Now, Ms. Spicer, to your knowledge have you ever worn any short skirts or a short dress at Buckingham?
 A I am a large woman. No. I don't wear mini-skirts, short dresses. I don't do that.
 Q And have you worn any blouses or tops where your nipples showed?
 A No.
 
 
 [5]
 Captain Perutelli, however, testified that he had never been told of this
 
 
 [6]
 The Commonwealth's argument, that the district court's finding in favor of Spicer on her hostile environment claim is subject to de novo review, is meritless. First, the Commonwealth asserts that there was insufficient evidence, as a matter of law, to permit the district court to find in Spicer's favor; as explained in text, our close review of the record makes it clear that this is simply not so. The Commonwealth's alternative argument, that the district court's hostile environment finding warrants de novo review because it was a mixed question of law and fact, has been expressly rejected in this circuit. Dwyer, 867 F.2d at 187
 
 
 [7]
 Q Okay. Now would you agree with me that certain types of jokes of a sexual nature can create a hostile work environment in violation of Title VII?
 A What do you consider certain types of jokes?
 Q I'm just giving an example.
 A I mean, you tell me....
 Q Now ... I started off by asking you the question isn't it true that certain types of jokes can lead to sexual harassment? Is the answer yes or no, sir?
 A And I also, m'am, I asked you what type of jokes you were speaking of....
 A Sexual--jokes of a sexual nature can--
 Q Can cause sexual harassment?
 A Not necessarily sexual harassment, but a very, very, very uncomfortable environment.
 
 
 [8]
 The jury's finding "that the filing of a civil rights claim by plaintiff was a motivating factor in the Defendant's decision to remove her from the Work Committee in December 1991" also suggests that such an assumption would be erroneous. The jury found that Warden Smith was motivated to remove Spicer from the Work Committee because she had filed a sex discrimination claim, even though the Warden had been individually counseled and attended both of Sizer's sessions
 
 
 [9]
 There is no evidence that Soles was counseled to take, or independently took, any action to correct his mistake in disseminating the August 1 memo to his staff. Likewise, there is no evidence that his staff or Dixon's received any group or individual training on sexual harassment in connection with this incident
 
 
 [10]
 The district court orally stated it was "going to rule for the plaintiff .... in order to make sure that the Department of Corrections gets the message, truly gets the message."
 
 
 [11]
 Contrary to the suggestion in the dissent, we do not hold that any of these measures are "requirements" for an adequate remedial response. We simply hold that--in conjunction with the other evidence discussed in text--the failure to provide them supplies sufficient evidence for a fact finder to conclude that in this case there was an inadequate remedial response
 
 
 [12]
 The totality of this evidence supports the district court's finding, in part, because it demonstrates that the attitudes that permitted and perpetuated acts of sexual harassment remained largely unchanged by the Department's remedial measures. These attitudes contributed to the hostile environment, and the Department's unwillingness or inability to alter them belies the adequacy of its remedial response
 
 
 [13]
 Spicer did not argue and, therefore, we do not decide whether she could be entitled to attorney's fees under 42 U.S.C. Sec. 2000e-5(g)(2)(b)(ii) (1994). We note that, in any event, it is unclear whether Sec. 2000e-5(g)(2)(b)(ii), which became effective on November 21, 1991, can be applied to facts that, in part, precede its effective date or, even if Sec. 2000e-5(g)(2)(b)(ii) could be applied to the present facts, whether it would affect Spicer's claim because her retaliatory discharge claim was formally brought under Sec. 2000e-3, not Sec. 2000e-2(m)
 
 
 [14]
 Of course, on remand the district court could find that the retaliatory discharge claim was "inextricably intermingled" with the hostile environment-sexual harassment claim. See Arvinger v. Mayor & City Council of Baltimore, 31 F.3d 196, 202 (4th Cir.1994); Willie M. v. Hunt, 732 F.2d 383, 386 (4th Cir.1984). As we noted in Plyler v. Evatt, 902 F.2d 273, 280 (4th Cir.1990), "determinations of relatedness of claims and the quality of overall results are not reached through application of any precise rules or formulae, but rather through an equitable judgment of the district court exercising discretion in light of the concerns expressed in Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)."